YUCAIPA AMERICAN ALLIANCE FUND II, L.P., a Delaware limited partnership, and Yucaipa American Alliance (Parallel) Fund II, L.P., a Delaware limited partnership, Plaintiffs,

v.

Leonard RIGGIO, Stephen Riggio, George Campbell Jr., Michael J. Del Giudice, William Dillard, II, Patricia L. Higgins, Irene R. Miller, Margaret T. Monaco, Lawrence S. Zilavy, and Barnes & Noble, Inc., a Delaware corporation, Defendants.

C.A. No. 5465–VCS.

Court of Chancery of Delaware.

Submitted: July 22, 2010.

Decided: Aug. 12, 2010.

---

15. *Chase Alexa, LLC v. Kent County Levy Court*, 991 A.2d 1148, 1152 (Del.2010).

David C. McBride, Esquire, Richard H. Morse, Esquire, Melanie K. Sharp, Esquire, Martin S. Lessner, Esquire, Kristen Salvatore DePalma, Esquire, James L. Higgins, Esquire, Emily V. Burton, Esquire, James M. Yoch, Jr., Esquire, Kathaleen McCormick, Esquire, Megan C. Haney, Esquire, Richard J. Thomas, Esquire, Nicholas J. Rohrer, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Stephen D. Alexander, Esquire, Beth I.Z. Boland, Esquire, J. Warren Rissier, Esquire, Matthew J. Lawson, Esquire, Karen J. Pazzani, Esquire, Bingham McCutchen LLP, Los Angeles, California, Attorneys for Plaintiffs Yucaipa American Alliance Fund II, L.P. and Yucaipa American Alliance (Parallel) Fund II, L.P.

Peter J. Walsh, Jr., Esquire, Michael A. Pittenger, Esquire, Dawn M. Jones, Esquire, William E. Green, Jr., Esquire, Ryan W. Browning, Esquire, Potter Anderson & Corroon, LLP, Wilmington, Delaware; Sandra C. Goldstein, Esquire, Kevin J. Orsini, Esquire, Cravath, Swaine & Moore, LLP, New York, New York, Attorneys for Defendant Barnes & Noble, Inc.

Kenneth J. Nachbar, Esquire, Susan W. Waesco, Esquire, Shannon E. German, Esquire, Morris, Nichols, Arsht & Tunnell, LLP, Wilmington, Delaware, Attorneys for Defendants George Campbell Jr., Michael J. Del Giudice, William Dillard, II, Patricia L. Higgins, Irene R. Miller, and Margaret T. Monaco.

Gregory P. Williams, Esquire, Lisa A. Schmidt, Esquire, Blake Rohrbacher, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware; Eric Rieder, Esquire, John Kircher, Esquire, Bryan Cave LLP, New York, New York, Attorneys for Defendants Leonard Riggio, Stephen Riggio, and Lawrence S. Zilavy.

## OPINION

STRINE, Vice Chancellor.

### I. *Introduction*

Less than two years ago, billionaire investor Ronald Burkle called Leonard Riggio, the founder of Barnes & Noble, Inc., to indicate that Burkle's funds, Yucaipa American Alliance Fund II, L.P. and Yucaipa American Alliance (Parallel) Fund II, L.P. (collectively, "Yucaipa"), were going to invest in Barnes & Noble. The two men knew each other well, having participated in a joint investment under Burkle's leadership. Because that endeavor had not gone well for Riggio and because Riggio generally preferred not to have other large holders in Barnes & Noble, he tried to persuade Burkle to take his money elsewhere. But Burkle was not dissuaded, and invested in Barnes & Noble.

As in their previous venture, Burkle and Riggio soon were at odds. Burkle touted several ideas for Barnes & Noble to Riggio, which Riggio did not cause Barnes & Noble to pursue. But what really fueled Burkle's ire was when he learned in August 2009 that Barnes & Noble was to acquire a college bookstore chain that had been wholly-owned by Riggio. Burkle communicated his disappointment with how Barnes & Noble was governed, and his fund, Yucaipa, began to increase its stake in the company. Over a four day period in November 2009, Yucaipa approximately doubled its stake in Barnes & Noble to nearly 18%.

In response to the rapid accumulation of shares in Barnes & Noble by Yucaipa, the Barnes & Noble board of directors adopted a poison pill. That pill is triggered when a shareholder acquires over 20% of Barnes & Noble's outstanding stock, or when two or more shareholders, who combined own over 20%, enter into an "agreement, arrangement or understanding ... for the purpose of acquiring, holding, voting ... or disposing of any voting

securities of the Company."[1] Notably, however, the pill's 20% threshold does not apply to Riggio or his family, whose approximately 30% stake was grandfathered under the terms of the pill. The pill, however, also limited Riggio from further increasing that stake.

Yucaipa then brought this action against the Barnes & Noble directors, claiming that the adoption of the pill, and the board's refusal to amend the pill per Burkle's specific suggestions, was a breach of the directors' fiduciary duties. As relief, Yucaipa argues that the pill's threshold as to Yucaipa should be increased to equal that applicable to Riggio, and that the pill trigger should be amended to allow Yucaipa to form a coalition with other investors to run a joint slate in a proxy contest this autumn. Yucaipa supports this request for relief with the argument that the pill was a disproportionate response to an illusory threat.

For the reasons set forth below, I reject Yucaipa's arguments. Yucaipa swiftly bought up an approximately 18% stake in Barnes & Noble, and its controller, Burkle, repeatedly indicated in public filings and letters to the board that he intended to effect changes in the company's governance, and reserved the right to buy up to 50% of the company's shares and to propose M & A transactions. Burkle's recommended changes included adding three or four additional independent directors to Barnes & Noble's board, entering into a partnership with a technology company, such as Hewlett–Packard Co. ("HP"), to revamp Barnes & Noble's product offerings, and acquiring at least part of its primary competitor, Borders Group, Inc. ("Borders"). Burkle also noodled over taking Barnes & Noble private in a leveraged buyout. Furthermore, another investment advisory firm, which frequently followed Yucaipa in its investments, also accumulated an equally large stake in Barnes & Noble, raising the spectre that a de facto group of shareholders with the potential to exert potent influence over, if not outright control of, Barnes & Noble could emerge if a pill was not in place.

In response to this threat that the corporation's stockholders would relinquish control through a creeping acquisition without the benefit of receiving a control premium, the board adopted a measured pill that protected Barnes & Noble's shareholders without precluding Yucaipa's ability to exercise its franchise rights by having the chance to run an effective proxy contest. Indeed, the record indicates that even with the pill in place, Yucaipa not only has a reasonable chance to, but is in fact likely to, prevail in a proxy contest if it runs a credible slate of candidates and articulates a sound business platform justifying the slate's election. Thus, the board's decision to use the pill to ensure that Yucaipa could not acquire control while bypassing negotiations with the board was reasonable because it addressed that threat while leaving Yucaipa with a fair chance to prevail in a proxy contest. Moreover, the pill is subject to a stockholder vote this year, a feature that further limits its inhibiting potency.

## II. *Factual Background*

These are the facts as I find them after trial.

### A. *Riggio Establishes Barnes & Noble And Retains A Large Stake After The Company Goes Public*

Following his start as a small independent bookseller in Greenwich Village, New

---

**1.** JX–359 (Rights Agreement between Barnes & Noble, Inc. and Mellon Investor Services, LLC (Nov. 17, 2009)) (the "Rights Plan") § 1.

York, Riggio acquired the Barnes & Noble trade name and Fifth Avenue bookstore in 1971.[2] The business was operated as a private company until 1993, when Barnes & Noble's shares began trading on the New York Stock Exchange.[3] After the initial public offering, Riggio retained about a third of Barnes & Noble's stock.[4] Although his holdings declined slightly for some time, Riggio increased his stake in the company to 31.9% in April 2008—up from 22.8% in April 2006—in response to the purchase of 10.1% of the company's stock by Pershing Square Capital Management, L.P. ("Pershing") in 2007.[5] Currently, along with his brother Stephen Riggio, Riggio holds 28.91% of Barnes & Noble's outstanding stock.[6]

Although Riggio has never held a majority of Barnes & Noble's stock since the company went public in 1993, it is also true that he has never entirely given up control. As the founder, Riggio serves as the Chairman of Barnes & Noble's board, and, as is discussed further below, takes a central role in the board's deliberations. His brother, Stephen Riggio, served for many years until March 2010 as the company's chief executive officer and remains a director.[7] Riggio described his place in the company as follows:

I think that I had been the founding shareholder of Barnes & Noble, had always been the largest shareholder of Barnes & Noble, had from time to time bought more shares in the company, and, yes, then and now, you know, *I have a strong preference for being the largest shareholder of Barnes & Noble being the founder. I think it is good for the company and good for me.*[8]

Riggio's centrality is reflected in the Barnes & Noble board. Besides his brother Stephen, two other directors have close ties to Riggio. Lawrence Zilavy is Riggio's personal financial advisor and had worked for Riggio as an executive at Barnes & Noble College Booksellers, which Riggio owned at that time,[9] and is admittedly not an independent director.[10] More controversial is the case of Michael Del Giudice. Del Giudice has had a high-profile career as a key staffer in New York politics. He and Riggio are Democrats, and Del Giudice admits that Riggio has regularly contributed, at Del Giudice's request, to candidates that Del Giudice suggests.[11] For a political powerbroker, that kind of relationship is valuable. More importantly, Del Giudice's day job is as the Chairman of Rockland Capital, which co-

---

2. JX–790 (Barnes & Noble History from Company website).

3. Id.

4. JX–4 (Barnes & Noble Prospectus (Sept. 29, 1993)) at 13, 54.

5. *See* JX–36 (Barnes & Noble Schedule 14A (May 3, 1999)); JX–41 (Barnes & Noble Schedule 14A (May 8, 2000)); JX–44 (Barnes & Noble Schedule 14A (May 4, 2001)); JX–48 (Barnes & Noble Schedule 14A (May 1, 2002)); JX–50 (Barnes & Noble Schedule 14A (Apr. 23, 2003)); JX–52 (Barnes & Noble Schedule 14A (Apr. 30, 2004)); JX–59 (Barnes & Noble Schedule 14A (Apr. 27, 2005)); JX–77 (Barnes & Noble Schedule 14A (Apr. 17, 2006)); JX–109 (Barnes & Noble Schedule

14A (Apr. 23, 2007)); JX–155 (Barnes & Noble Schedule 14A (Apr. 24, 2008)); JX–235 (Barnes & Noble Schedule 14A (Apr. 16, 2009)).

6. JX–763 (Expert Report of Peter C. Harkins) ("Harkins Report").

7. Pre–Trial Stip. ¶¶ 19, 20.

8. Riggio Dep. at 165 (emphasis added).

9. Tr. at 1006–07 (Del Giudice).

10. *See* Defs.' Op. Pre–Trial Br. at 6; Def's Op. Post–Trial Br. at 54–57.

11. Tr. at 1008–09 (Del Giudice).

manages a fund called Midland Cogeneration Venture ("Midland").[12] Midland is not a huge fund, being around $164 million in size. Riggio has made sizable investments totaling $4.8 million in Midland in the past, and recently committed $20 million over the next three years to another fund that Rockland manages, which is $275 million in size.[13] Although Del Giudice has crafted a contractual provision that supposedly ensures that he does not directly profit personally from the monies attributable to Riggio's investments,[14] Del Giudice's main occupation is running Rockland, which depends heavily on funds under management for its revenues.[15] Indeed, it seems to me obvious that it is material to the success of Del Giudice's fund that wealthy, prominent people like Riggio entrust their capital to it.[16] The funds Riggio invests relative to the size of the Rockland funds, in my view cannot be viewed as immaterial.

What makes Del Giudice notable is that he has been determined by the Barnes & Noble board to be independent under the strict NYSE rules that have existed since the Enron–WorldCom meltdown.[17] I do not lightly ignore that determination, but on the limited record before me I cannot conclude that the business and political ties between Del Giudice and Riggio render Del Giudice independent of Riggio.

What also makes this issue more piquant is that Del Giudice was the director selected by his colleagues to be the lead director of the Barnes & Noble board.[18]

Although Yucaipa has mounted a weak challenge to the independence of the remaining five Barnes & Noble directors, it has failed to identify any material facts that suggest that any of these directors—George Campbell, William Dillard, Patricia Higgins, Irene Miller, or Margaret Monaco—is beholden to Riggio. The strongest evidence of a lack of independence Yucaipa has presented is that Miller is a former Barnes & Noble executive.[19] Although Miller likely naturally harbors some residual respect for Riggio, and one doubts she would be on the Barnes & Noble board if she did not have a good relationship with him, it has been over ten years since she was a Barnes & Noble executive in 1997,[20] and she thus satisfies the NYSE's cooling-off period.[21] I decline, without more facts, to base a finding of non-independence solely on Miller's distant service as Riggio's subordinate.

All in all, therefore, the Barnes & Noble board is comprised of a bare majority of independent directors. But, in my view, it also continues to have a good deal of the feel of the board of a controlled company.

12. *Id.* at 1009–14 (Del Giudice).

13. *Id.* at 971–72 (Del Giudice).

14. *Id.* at 973 (Del Giudice).

15. *Id.* at 1009–14 (Del Giudice).

16. *Id.* at 1012–13 (Del Giudice) (explaining that Rockland received management fees based upon the size of its fund and success of its fund's investments).

17. JX–234 (2009 Proxy) at 4; Tr. at 763 (Daniels); *see* NYSE, Corporate Governance Rules, http://www.nyse.com/pdfs/finalcorpgovrules.pdf, at 4–6.

18. Tr. at 965 (Del Giudice).

19. Pre–Trial Stip. ¶ 32. Miller served as Barnes & Noble's Chief Financial Officer from September 1993 to June 1997.

20. *Id.*

21. The NYSE Rules provide that a director who was employed by the company becomes "independent" after a three year cooling-off period. *See* Final NYSE Corporate Governance Rules, http://www.nyse.com/pdfs/finalcorpgovrules.pdf.

B.  *In November 2008, Yucaipa Takes
A Stake In Barnes & Noble*

Riggio and Burkle first crossed paths about twelve years ago, when they became involved in a joint investment.[22]  At the time, Burkle had just bought a logistics company which had Barnes & Noble as one of its largest customers, and Burkle went to New York City to meet with Riggio to discuss the two companies' relationship.[23]  After that meeting, Riggio invested in the logistics company, a decision Riggio would come to rue because the investment did not go well.  Although Burkle claimed that the investment underperformed due to the technology bubble bursting,[24] Riggio testified that the problems resulted from Burkle's poor treatment of his other partners.[25]

In November 2008, Burkle called Riggio to alert him that he was thinking of investing in Barnes & Noble.[26]  Shortly thereafter, Yucaipa began buying Barnes & Noble shares and acquired approximately an 8% stake in the company.[27]  Once Yucaipa had purchased the shares, Burkle again called Riggio, who requested that the two of them meet to discuss Yucaipa's intentions.[28]  Burkle agreed, and the two later met at the Bowery Hotel in Manhattan in late March 2009 (the "Bowery Meeting").

One of the first things Burkle and Riggio discussed at the Bowery Meeting was their ongoing partnership in the logistics company.[29]  Having lost millions of dollars on that deal, Riggio wanted to get out of that relationship.[30]  Thus, he asked Burkle if he wanted to buy Riggio's shares in that investment at a discount, an offer which Burkle refused.[31]

In part because he was unhappy with how that prior venture had progressed over the years, Riggio also attempted to dissuade Burkle from investing in Barnes & Noble.[32]  But my sense is that Riggio does not warmly welcome any other large investors in Barnes & Noble, and thus Riggio had even less taste for having someone who he had come to disdain becoming an influence in the company he had founded.  Undeterred by Riggio's lack of receptivity, Burkle told Riggio of a number of ideas he had regarding Barnes & Noble's strategy going forward.  Burkle's chief suggestion, which he referred to as "the thesis" for Yucaipa's investment, was that Barnes & Noble should somehow form a partnership with a technology company, such as HP. Burkle thought HP would be interested in a quality retail partner like Barnes & Noble as a way to rival

22.  Tr. at 13–14 (Burkle).

23.  *Id.* at 14–15 (Burkle).

24.  *Id.* at 16 (Burkle).

25.  Riggio Dep. at 68–69.

26.  *See* Burkle Dep. at 155–163;  Riggio Dep. at 58–60.

27.  JX–184 (Yucaipa 13D (Jan. 2, 2009)).

28.  Tr. at 469–70 (Riggio).

29.  Riggio Dep. at 117.

30.  Riggio claimed that the losses he sustained through that venture were a result of Burkle's

poor decisions, *see* Tr. at 521–524 (Riggio), and Burkle himself admitted that the investment was a dud.  *See id.* at 16–18 (Burkle).

31.  *Id.* at 61 (Burkle).

32.  *Id.* at 68 (Burkle) ("Q. Did you try and dissuade him from investing and continue to invest in Barnes & Noble?  A. I don't—I may have.  I may have told him that I didn't like the idea that he was invested in Barnes & Noble, that I was completely unhappy with our partnership at Alliance for many, many years.  I had tried for all of ten years to extricate myself from the partnership, and I did not particularly think highly of him as a— I didn't think highly of his judgment and didn't think highly of him as a partner.").

Apple, Inc.'s dominance in consumer electronics.[33] And, such a partnership would give Barnes & Noble an edge in competing with the likes of Amazon.com, whose e-book reader, the "Kindle," had beaten Barnes & Noble's e-book reader, the "Nook," to the market.[34] Burkle also recommended considering an acquisition of certain of the most valuable retail stores of Barnes & Noble's competitor Borders, which was in financial distress at the time.[35] Were Borders to go into bankruptcy, Burkle suggested that Barnes & Noble purchase Borders' best performing stores.[36] That idea, which he referred to as the "Best of Borders" strategy, was similar to a plan floated earlier by Pershing, and Burkle admitted to Riggio at the Bowery Meeting that he had spoken with another prominent investor, Pershing's William Ackman, about a possible Barnes & Noble acquisition of Borders.[37] Pershing was the largest stockholder of Borders, and, as mentioned before, had previously bought (and later sold) a large stake in Barnes & Noble, a purchase that had led Riggio to increase his own holdings.[38]

Riggio responded to the "Best of Borders" idea by insisting that, due to the financial crisis and the bursting of the real estate bubble, he did not want the additional exposure that acquiring any of Borders' stores—even the highest performing locations—would bring,[39] and that "merging with Borders would be a disaster" because of what he perceived to be a "coming crisis in American retail."[40] Thus, the meeting concluded with a difference of opinion, although Burkle conceded that Riggio's position on the Borders option made sense.[41]

C. *In August 2009, Barnes & Noble Announces Its Acquisition Of College Booksellers, And Burkle Objects To The Deal*

Although Burkle's conversation with Riggio had not produced any further discussions in pursuit of Burkle's ideas, Yucaipa maintained its investments in Barnes & Noble, and Burkle did not agitate for the adoption of his strategies. But in August 2009, Barnes & Noble made an announcement that deeply disturbed Burkle. On August 10, 2009, Barnes & Noble announced that it had entered into an agreement to purchase all of the stock in Barnes & Noble College Booksellers ("College Booksellers").[42]

Burkle could not understand why Barnes & Noble had chosen to acquire College Booksellers, a then-independent college bookstore company owned by Riggio and his wife, for $596 million in cash in

33. *Id.* at 21–25 (Burkle).

34. *Id.* at 25 (Burkle).

35. *Id.* at 26–31 (Burkle).

36. *Id.* at 29–30 (Burkle).

37. *Id.* at 26–29 (Burkle).

38. *Id.* at 36–27 (Burkle), 472 (Riggio).

39. *Id.* at 30 (Burkle) ("Len gave a very strong, almost speech, if you will, that—and, again, you have to look almost in the time frame, because there was a lot of uncertainty in the

financial markets, a lot of uncertainty in the world—that there is still but it was much worse then. And Len said, 'With all that's going on, I don't want one more—I don't want exposure to one more retail store.'").

40. Riggio Dep. at 59–60.

41. Tr. at 31 (Burkle) ("I effectively said, 'I can't argue with that. That makes sense.'").

42. Director Defs.' Ans. ¶ 38. Although they shared the same name from the perspective of their retail customers, Barnes & Noble College Booksellers and Barnes & Noble Inc. were separate entities, albeit ones with a common founder.

an interested transaction.[43] To Burkle, that decision contradicted what Riggio had said at the Bowery Meeting because it appeared to deepen Barnes & Noble's retail and real estate exposure just like a Borders deal would.[44] Burkle therefore wrote Riggio a stinging private letter expressing his objection to the College Booksellers deal.[45] Stating that he would have "[n]ever ... imagine[d] that [Riggio] would try to put these two companies together" and that it was "contrary to everything that [Riggio had] told [him]," Burkle made clear his disappointment with the deal, asserting that the acquisition was bad for Barnes & Noble and for Riggio's reputation.[46] Despite Burkle's objection, a poor to at best tepid market reaction, and the opposition of several other stockholders, the transaction closed on September 30, 2009.[47] Litigation to challenge the fairness of this transaction is ongoing in this court.[48]

D. *Yucaipa Increases Its Stake In Barnes & Noble To Approximately 18%, And The Board Adopts The Rights Plan*

1. *In A Short Period Of Time, Yucaipa More Than Doubles Its Stake In Barnes & Noble*

Shortly after the College Booksellers deal closed, Yucaipa dramatically increased the number of Barnes & Noble shares it owned. On November 13, 2009, Yucaipa disclosed in a Schedule 13D filing that it had increased its stake to 16.8%, and on November 17, 2009, it further disclosed that it had increased its stake to 17.8% (the "Yucaipa 13Ds").[49] Those disclosures indicated that the bulk of the shares were acquired over the previous four days.[50] The Yucaipa 13Ds criticized Barnes & Noble's management and corporate governance policies, reserved Yucaipa's right to pursue a wide range of options, and were capaciously drafted enough to encompass even a purchase of the company:

> [Yucaipa] ha[s] acquired the shares ... in open market transactions because, in [its] opinion, the shares represent an attractive opportunity. *However, [Yucaipa is] concerned with the adequacy and enforcement of the Company's corporate governance policies and practices, as evidenced in part by the recent acquisition of [College Booksellers]. [Yucaipa] intend[s] to express [its] views regarding the need for improved corporate governance to the board of directors and the management of the Company.*
>
> [Yucaipa] intend[s] to closely monitor the Company's performance and may modify [its] plans in the future depending on [Yucaipa's] evaluation of various factors, including the investment potential of the Common Stock, the Company's business prospects and financial po-

---

43. PX–284 (Barnes & Noble Form 8–K (Oct. 1, 2009)) at 2.

44. Tr. at 32 (Burkle) ("So he said he was trying to get away from those things, and here he kind of did the biggest one he'd ever done. And it just surprised me. It was just counter to everything I would expect him to do."); *id.* at 37 (Burkle).

45. JX–265 (letter from Ronald Burkle to Leonard Riggio (Aug. 14, 2009)).

46. *Id.*

47. PX–284 (Barnes & Noble Form 8–K (Oct. 1, 2009)).

48. *In re Barnes & Noble S'holder Deriv. Litig.,* C.A. No. 4813–VCS.

49. JX–311 (Yucaipa Schedule 13D/A (Nov. 13, 2009)); JX–399 (Yucaipa Schedule 13D/A (Nov. 17, 2009)).

50. *See* JX–311.

sition, other developments concerning the Company and its competitors, opportunities that may be available to the Company, the price level and availability of the Common Stock, *available opportunities to acquire or dispose of the Common Stock,* realize trading profits or minimize trading losses, conditions in the securities markets and general economic and industry conditions, reinvestment opportunities, developments relating to the business of [Yucaipa] and other factors deemed relevant by [Yucaipa]. *In connection with the activities described above, [Yucaipa] may communicate with, and express their views to, other persons regarding the Company, including, without limitation, the board of directors and management of the Company, other shareholders of the Company and potential strategic or financing partners.*[51]

To that end, Yucaipa also reserved the right to pursue a variety of M & A transactions, stating that it "may in the future exercise any and all of [its] respective rights as shareholder[ ] of the Company in a manner consistent with [its] equity interests," including "the events referred to in paragraphs (a) through (j), inclusive, of Item 4 of Schedule 13D."[52] Those events include "[a]n extraordinary corporate transaction, such as a merger, reorganization or liquidation," and the "sale or transfer of a material amount of assets."[53]

In addition to those disclosures, Yucaipa also made two notifications pursuant to the

Hart–Scott–Rodino Act indicating that it intended to purchase Barnes & Noble stock with a value between $130.3 and $651.7 million.[54] Based on the November 13, 2009 price of Barnes & Noble stock, a $651.7 million purchase would have given Yucaipa control over a majority of Barnes & Noble stock.[55]

During this same time, Burkle also took meetings with two large investment banks, Bank of America and Deutsche Bank, about the possibility of a leveraged buyout of the company.[56]

### 2. Barnes & Noble Seeks Outside Legal Counsel In Response To The Yucaipa 13Ds

Upon receiving notice of the first Yucaipa 13D, Barnes & Noble's then-General Counsel, Jennifer Daniels, immediately reached out to Scott Barshay, a corporate partner at Cravath, Swaine & Moore LLP ("Cravath") on Friday, November 13, 2009. Daniels contacted Barshay not only because Cravath had served as Barnes & Noble's counsel for about a year, but also due to her frequent interaction with Cravath attorneys during her prior employment at IBM, one of Cravath's long-time clients.[57] During Daniels' initial phone call with Barshay, Barshay mentioned the possibility that a poison pill might be an appropriate response.[58] Later that day, Barshay reviewed the Yucaipa 13D and was struck by the large amount of stock that had been acquired in a "very short time," and by the language used to criticize the

---

51. *Id.* (emphasis added).

52. *Id.*

53. U.S. Securities and Exchange Commission, Schedule 13D, Item 4.

54. JX–321 (Letter from Yucaipa to Leonard Riggio notifying of HSR filings (Nov. 13, 2009)).

55. *See* JX–311 at 9; Tr. at 766 (Daniels).

56. *Id.* at 36, 122–24 (Burkle).

57. *Id.* at 767, 822–24 (Daniels).

58. *Id.* at 879 (Barshay) ("We talked about the situation generally. I brought up right away the possibility of a pill.").

Barnes & Noble board.[59] Over the weekend, a team of Cravath attorneys analyzed Barnes & Noble's takeover defense profile, and began drafting a rights plan (the "Rights Plan").[60]

As their analysis progressed over that weekend, Barshay "quickly came to the point of view . . . that the right thing to do was to put in a rights plan, and essentially freeze the situation so that nobody outside of . . . Len Riggio could get above 20 percent."[61] Barshay explained his reasoning as follows:

> I thought that they should very quickly adopt a pill. There had just been a very rapid accumulation of stock. There was no way to know whether Mr. Burkle would keep on buying and where, if anywhere, he would stop. I thought the right thing for the board to do was to quickly put in a pill so it would have certainty as to the situation.[62]

Barshay further explained that, although he considered the fact that Yucaipa did not have a history of going hostile with respect to their investments, he still felt that a pill was advised:

> In that situation—in that kind of a situation, I think the right thing—and I thought at the time the right thing for this board to do—was to put in a pill. It doesn't matter who it is. It doesn't matter what their history is. When somebody, without any advance warning,

ends up with, you know, 16, 17, 18 percent of your stock, I think that the right thing for a board to do in that situation . . . is to put in a pill, make sure that the shareholder—make sure you don't put the shareholders in a situation where control might go away without them—without them receiving, you know, what the board views is an appropriate premium.[63]

Barshay shared that advice at two meetings held on Monday, November 16, 2009 with Daniels, Barnes & Noble's chief financial officer, and Barnes & Noble's head of investors relations.[64] During those meetings, Barshay walked the Barnes & Noble representatives through the mechanics of the Rights Plan his team had drafted over the weekend.[65]

### 3. The Draft Rights Plan

The Rights Plan's key provisions, which are discussed in greater detail later in the analysis, can be summarized as follows:

- In the event that any person or group acquires beneficial ownership of more than 20% of Barnes & Noble's common stock, each share of common stock would be able to exercise an option to purchase 1/1000th of a share of a new series of preferred stock;[66]
- The definition of "beneficial ownership" includes not only the shares held by a stockholder but also the shares of

59. *Id.* at 881 (Barshay).

60. *Id.* at 882–83 (Barshay).

61. *Id.* at 883 (Barshay).

62. *Id.* at 884 (Barshay).

63. *Id.* at 885–86 (Barshay).

64. The first meeting involved only Daniels, Sheedeh Moayery, who was another in-house Barnes & Noble attorney, and one of Barshay's partners, George Schoen. Michael Rosen of Bryan Cave, a law firm that had served not only as outside counsel for Barnes & Noble, but also as personal counsel for Riggio and the Riggio family businesses, was also present. *Id.* at 890 (Barshay). The second meeting involved the same people plus Barnes & Noble's chief financial officer and head of investor relations. *Id.* at 824 (Daniels), 891 (Barshay).

65. *Id.* at 888–89 (Barshay).

66. Rights Plan § 1.

any person with whom a stockholder has certain "agreements, arrangements or understandings," including for the "purpose of acquiring, holding, voting ... or disposing of any voting securities of the Company;"[67] and

- Riggio's approximately 30% stake would be grandfathered in under the Rights Plan, but he was to be precluded from purchasing additional shares subject to a few narrow exceptions.[68]

Thus, the Rights Plan prevented a single holder from accumulating more than 20% of Barnes & Noble's stock and, as important, prevented the formation of a group of two or more large blocholders from joining together to take control of the company. Barshay's reason for setting the threshold at 20%, as shall be discussed, was that the Riggios owned 30% of the stock, and that a lower cap raised preclusion issues that might have concerned the influential proxy advisory firm, Risk Metrics.[69] Thus, Barshay intended to propose that the Rights Plan's trigger be set at the high end of the typical range—20%—rather than at the more common level of 15%.[70]

#### 4.  *The Board Adopts The Rights Plan On November 17, 2009*

The following day, November 17, 2009, Daniels called a board meeting to discuss how to respond to Yucaipa's rapid acquisition of shares. From the get-go, Barshay and Daniels seem to have concluded that there was no reason that the full Barnes & Noble board should not act to consider whether to adopt the Rights Plan. Likewise, there appears to have been no Jack Handey deep thinking done as to whether the outside counsel and investment bank hired to advise the board should have been selected by the independent directors themselves, in a process not involving Riggio. Rather, when the independent directors were first called to a board meeting on November 17 to consider the pill, Daniels as, General Counsel, had already brought Cravath, who had served as the company's counsel for a year, on board.[71] Likewise, Morgan Stanley, who was Riggio's personal investment advisor and had previously been hired by Riggio to give him advice on the College Booksellers transaction, was retained by Barnes & Noble to advise it on the Rights Plan.[72] Before the November 17 meeting, Riggio met with representatives from Morgan Stanley alone,[73] and there is no indication in the meeting minutes, described more fully below, that he shared whatever insights were obtained at that meeting with the rest of the board. Likewise, Bryan Cave, a law firm that had advised Riggio personally on estate planning and other matters, and was long-time company counsel, was in the mix.[74]

Thus, the advisors who were beginning to shape the board's response were identified by managers who worked for Riggio and, in the case of Morgan Stanley and Bryan Cave, were ones with strong prior ties to Riggio. Indeed, Morgan Stanley had been adverse to Barnes & Noble in the controversial College Booksellers transaction,[75] which put it in an odd position to advise the company about a situa-

67.  *Id.*

68.  *Id.*

69.  Tr. at 888–89 (Barshay).

70.  *Id.*

71.  *Id.* at 822–24 (Daniels).

72.  *Id.* at 773–74, 824–26 (Daniels).

73.  *Id.* at 491 (Riggio).

74.  *Id.* at 824 (Daniels).

75.  *Id.* at 483–84 (Riggio).

tion inspired in large part by the idea that the College Booksellers transaction was unfair to Barnes & Noble.

That said, it appears that Daniels, rather than Riggio, was the prime mover in getting advisors on board, particularly the lead advisor, Cravath. As important, Yucaipa's rapid purchases and indication of a willingness to buy up to half of Barnes & Noble's shares undoubtedly put extreme time pressure on the response. Thus, the board had to assemble its advisors quickly.

But what is clear is that from that initial response onward, the full board, without any role for separate deliberations by the independent directors, took on the role of addressing the response to Yucaipa's purchases.

Before that meeting, the board received two packets of materials.[76] The first packet, sent in the morning, included: a copy of the draft Rights Plan; a memo from Cravath to the board explaining the draft Rights Plan; a two-page slide deck from Cravath summarizing the highlights of the draft Rights Plan; and, draft board resolutions adopting the Rights Plan.[77] The second packet, sent shortly before the meeting convened at 3:00 p.m., included: a revised set of board resolutions; a presentation from Morgan Stanley; and a draft press release.[78]

The November 17 meeting began with Riggio recounting his misbegotten partnership with Burkle. Riggio's description of Burkle was hostile, with Riggio summarizing his experience in four take-away points: first, the board "can't predict what [Burkle] will do;" second, "if [Burkle] keeps going, he'll create a private co[mpany];" third, "[Burkle]'s dangerous with other people's money;" and fourth, he (Riggio) "does not want to talk to [Burkle]." [79] As the board discussed Yucaipa's motivations, and especially the possibility that Burkle would try to push Barnes & Noble into a deal with Borders, Riggio said that there was no question that Burkle would increase his shareholding to over 20%, and that Burkle would go after board seats at the next election in September.[80] And, later in the discussion, Riggio described Yucaipa as a "clear and present danger." [81]

Barshay gave the board a more temperate and measured assessment of Yucaipa. Barshay noted that Burkle's standard technique was to get on a board through friendly means, and then to "quietly influence from the wings" once he was on.[82] Barshay then educated the board about their fiduciary duties when considering the implementation of takeover defenses, focusing the board on the balance between their duty to protect shareholders from a person acquiring control without paying a

---

76. These materials were less extensive than materials Cravath prepared for an earlier meeting with Daniels. *See* JX–322 (email from Jennifer Daniels to Sheedeh Moayery (Nov. 16, 2009)) (draft slides prepared by Cravath); Tr. at 766 (Daniels) (stating that she asked Cravath to shorten its materials for the board because the materials were longer than necessary and unfocused). Having read the longer materials, there is no sinister explanation for the materials not being shared in full. If shared, the longer version would have simply provided a deeper basis for the board's actions.

77. JX–350 (email from Jennifer Daniels to Leonard Riggio, et al. with attachments (Nov. 17, 2009)).

78. JX–351 (email from Jennifer Daniels to Leonard Riggio, et al. with attachments (Nov. 17, 2009)).

79. JX–355 (handwritten notes of Sheedeh Moayery (Nov. 17, 2009)).

80. *Id.*

81. *Id.*

82. *Id.*

premium with their duty to adopt defensive measures that are reasonable in relation to the threat posed, and not coercive.[83] Most important, Barshay advised the board that it could not adopt a Rights Plan if it would be preclusive of a proxy fight.[84]

After Barshay described the mechanics of the draft Rights Plan, and after Morgan Stanley gave its presentation on the Plan, an interesting discussion occurred. The notes of the meeting record Riggio saying that he wanted to "play devil's advocate," and that he should be allowed to acquire up to a 45% stake because "at 33% we are at risk." [85]

In response, Barshay noted that, under the Rights Plan as drafted, Burkle would have to win two successive proxy contests in order to gain control of the board because directors on Barnes & Noble's staggered board were up for election three at a time each year.[86] And, the Morgan Stanley representative said that adopting the Rights Plan looked better in the "public eye" than an "arms race" of open market stock purchases between Riggio and Yucaipa.[87]

That exchange is notable not only because of the obvious push-back against Riggio, but also because the discussion presumed that Yucaipa would likely run a proxy contest, accepted the possibility that Yucaipa may win that contest, and demonstrated a recognition that the board could not adopt a Rights Plan that would fore-

close an effective proxy challenge from Yucaipa because to do so would be preclusive.[88] That discussion is also noteworthy because of the identity of the directors who were up for reelection in September 2010. They were not just any directors. The directors who faced the electorate in less than a year included Leonard Riggio himself, along with his close affiliate and non-independent director Zilavy, and Del Giudice, the lead independent director.

The notes of the meeting also reflect that the board was already concerned that Yucaipa might join with another large shareholder. To wit, the notes record a comment that "Burkle could partner up." [89] The conversation also noted Yucaipa's HSR notification, which indicated that Yucaipa may acquire up to 50% of the company's stock.[90] Therefore, in addition to Yucaipa gaining unilateral control, the board also considered the possibility of Yucaipa forming a control group.

Throughout the November 17 meeting, Cravath appears to have been the lead advisor steering the discussion.[91] That is, although Morgan Stanley and Bryan Cave were involved in the discussion, there is no indication in the record that they exerted much, if any, influence over the board's deliberations. Upon the unanimous recommendation of all three advisors, the board adopted the Rights Plan at the conclusion of the meeting.[92]

---

83. Tr. at 245–46 (Higgins).

84. JX–355.

85. JX–356 (handwritten notes of Jennifer Daniels (Nov. 17, 2009)).

86. *Id;* JX–355.

87. JX–355.

88. *Id.*

89. JX–356.

90. *Id.* ("HSR—up to 50%").

91. JX–355. Neither Morgan Stanley nor Bryan Cave had a material influence on the drafting of the Rights Plan. Although both gave comments, Cravath chose not to accept them. Tr. at 891–93 (Barshay).

92. *See* JX–355.

### E. Burkle Complains To Board About The Rights Plan And Buys More Shares

Following the board's adoption of the Rights Plan, Burkle wrote Riggio a letter criticizing the decision on December 23, 2009.[93] That letter claims that, by adopting the Rights Plan, Riggio "threw down the gauntlet and . . . declared war," and that the "recent actions by the Company are not in the best interests of all shareholders."[94] Burkle also mentioned that he "thought that a 'take the best of Borders' strategy would have been much better for the shareholders [than the College Booksellers deal]," and that the shareholders had gotten so upset with the board that "the price [of Barnes & Noble stock] got attractive . . . and [Yucaipa] bought again."[95] Riggio notified the board of Burkle's letter at a January 6, 2010 meeting. Riggio said that the letter was evidence that Burkle was "not going to go away," and director Miller asked whether the board was "ready for this onslaught."[96] Like the discussion at the November 17 meeting, Miller's comment suggests that the board viewed a proxy contest as a real possibility, and one in which Yucaipa might prevail.

During that time, Yucaipa continued to buy Barnes & Noble stock, increasing its total ownership to 18.7%.[97]

### F. Aletheia Increases Its Stake In Barnes & Noble To Over 17%

But Yucaipa was not the only one buying large amounts of Barnes & Noble stock. At the same time Yucaipa was complaining to Riggio and the board, Aletheia Research and Management, Inc. ("Aletheia"), a California-based investment advisor, increased its stake in Barnes & Noble from 6.37% to 17.44%.[98] Notably, Aletheia, which had previously been a Schedule 13G or "passive investor" filer, filed a Schedule 13D after acquiring its 17% stake.[99] That Schedule 13D stated that Aletheia had "no plans or proposals" that would result in an "extraordinary corporate transaction" involving Barnes & Noble, but also expressly noted that "Aletheia however reserves the right, at a later date, to effect one or more of such changes or transactions."[100]

Aletheia's dramatic increase in its stake concerned the board because, as it was advised by Cravath and Morgan Stanley, Aletheia's founder, Peter Eichler, had followed Burkle's lead in at least three other

93. JX–457 (letter from Ronald Burkle to Leonard Riggio (Dec. 23, 2009)).

94. Id.

95. Id.

96. JX–468 (handwritten notes of Jennifer Daniels (Jan. 6, 2010)).

97. JX–520 (Yucaipa Schedule 13D (Feb. 1, 2010)).

98. DX–561 (Aletheia Schedule 13D (Feb. 9, 2010)).

99. Compare DX–217 (Aletheia Schedule 13G (Feb. 17, 2009)) with DX–561 (Aletheia

Schedule 13D (Feb. 9, 2010)). As it turns out, Aletheia changed to a Schedule 13D filer less than a month after meeting with Burkle. Schedule 13G allows "passive investors" owning more than 5%, but less than 20%, of a class of stock to avoid the more onerous filing requirements of Schedule 13D by certifying that their purpose in acquiring the securities is not to control the issuer. But, if such a "passive investor" is no longer able to certify that its purposes are passive, it must begin filing Schedule 13Ds. See Louis Loss & Joel Seligman, Fundamentals of Securities Regulation 619 (4th ed. 2004); 17 C.F.R. § 240.13d–1.

100. DX–453 (Aletheia Schedule 13D (Dec. 22, 2009)).

investments.[101] The evidence at trial also showed that Eichler and Burkle had met for lunch in both August 2009 and January 2010,[102] although Burkle disclaims having had any serious discussions about Barnes & Noble. Notably, however, their initial meeting on August 14, 2009 was the same day that Burkle sent his first letter to Riggio complaining about the College Booksellers transaction.[103] Furthermore, Eichler had a more detailed, and quite believable, recollection of the discussion. According to Eichler, Burkle and he discussed some specifics, such as Burkle's view that Barnes & Noble was a "cheap stock," that Riggio had initially discouraged Burkle from purchasing Barnes & Noble stock, and Burkle's belief that Barnes & Noble could be a leader of developing e-reader technology.[104] And, just days after their meeting on January 8, 2010, Burkle sent Eichler an article about Borders' struggling financial situation.[105]

Of course, even if the two had only a vague discussion about Burkle's plan for Barnes & Noble, sometimes chemistry and context allow for a channeling of emotion and thought that makes words superfluous. Such seems to be the case here between Burkle and Eichler. At his deposition, Eichler gushed over Burkle, and made clear that for him, the chance to talk investments with Burkle was equivalent to an aspiring songwriter getting to trade licks and lyrics with Dylan.[106] In the same deposition, Eichler expressed his view that Barnes & Noble would be fortunate to have Burkle on its board.[107] At trial, Burkle emphasized that he and Eichler had not reached any agreement about Aletheia voting with Yucaipa in a proxy contest, but he did acknowledge at his own deposition that, in the event of a proxy contest, he thought "[Aletheia] will give [him] a good listen." [108] The testimonial record supports the conclusion that the board had good reason to be concerned that these two large investors were capable of and interested in cooperating in a joint effort to take effective voting control of the company.

### G. After The Board Rebuffs His Requests, Burkle Files This Litigation

On January 26, 2010, Burkle wrote a letter to the full board demanding an exception to the Rights Plan to allow Yucaipa to buy up to a 37% stake in Barnes & Noble.[109] Unlike his first letter to Riggio months before, which Burkle claims had been a "non-lawyer letter," [110] Burkle's January 26 letter was clearly drafted with the help of lawyers and states that the Riggio "insiders'" stake in Barnes & Noble, combined with the 20% cap in the Rights Plan, had a "coercive effect on the

101. Harkins Report at 30

102. Burkle Dep. at 101–10; Eichler Dep. at 53–65.

103. Tr. at 79–80 (Burkle).

104. Eichler Dep. at 63–66.

105. Tr. at 95–96 (Burkle); JX–488 (email from Gina Zapanta to Peter Eichler (Jan. 15, 2010)).

106. Eichler Dep. at 57, 60–61 (describing the opportunity to spend time with Burkle as "very exciting," and stating that lunch with Burkle was "so much fun" that Eichler "could have sat there for 10 straight hours nonstop").

107. *Id.* at 199–200.

108. Burkle Dep. at 58.

109. JX–507 (letter from Ronald Burkle to the Barnes & Noble Board of Directors (Jan. 26, 2010)).

110. JX 457 (letter from Ronald Burkle to Leonard Riggio (Dec. 23, 2009)).

Company's other shareholders and [gave] the Riggio family a preclusive advantage in any proxy contest." [111] In a clear but unattributed citation to the Supreme Court's decision in *Unitrin*, Burkle wrote that the Rights Plan made his ability to win a proxy contest "mathematically impossible or realistically unattainable." [112]

At a meeting on February 16, 2010, the board considered Burkle's request to amend the Rights Plan to allow him to acquire a 37% stake in Barnes & Noble. Yucaipa's request, along with the large purchases by Aletheia, led the board to deliberate again about whether to maintain the Rights Plan and, if so, whether to alter its terms as requested by Yucaipa. Thus, on February 16, 2010, the board met and, with Barshay playing a leading role, the board went through a review of whether the company faced a threat that warranted the maintenance of the Rights Plan and whether, in view of the situation facing the company, the Rights Plan should be altered. [113]

In this process, a discussion occurred that can only be described as, well, weird. Obviously, Yucaipa had tabled an important issue. To wit, was it really reasonable to put a pill in place with a 20% trigger when the Riggios owned 28.91% of the shares, and the other directors and officers controlled another 3.26%, for a total of 32.17%? [114] Unavoidably, this required some consideration of the dangers

posed by Leonard Riggio himself. Would a pill make him what the board disclaimed he was, a controlling shareholder? This was an awkward discussion because the board faced litigation over the College Booksellers transaction and would wish to contend that although Leonard Riggio was Barnes & Noble's largest stockholder and its Chairman, and his brother was then still CEO, he was not a controlling stockholder. [115] Relatedly, it raised the topic of whether Leonard Riggio regarded Yucaipa as a threat, not so much to Barnes & Noble and its other stockholders, but to his continued sway over Barnes & Noble. At his stage in life, Riggio may not have wished to have *more* of his wealth tied up in Barnes & Noble, [116] but still would wish to be Barnes & Noble's major domo.

Instead of holding an executive session of the independent directors to ponder these issues, the board instead discussed whether Leonard Riggio was a threat in his presence, eventually determining, no doubt to his great relief, that he was not. Its rationale was a bit odd, and based on the fact that Leonard Riggio had not gone out of his way to buy control of Barnes & Noble, even after a 2008 rights plan had expired, [117] slighting the reality that Riggio increased his holdings when Pershing previously bought in and that he had managed to be Barnes & Noble's key strategic leader without having to do so, as well as

111. JX–507 (letter from Ronald Burkle to the Barnes & Noble Board of Directors (Jan. 26, 2010)).

112. *Id.; see Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1388 (Del.1995).

113. *E.g.,* JX–589 (handwritten notes of Jennifer Daniels (Feb. 16, 2010)); JX–572 (board materials for the February 16 meeting).

114. *See* JX–783 (Burch Rebuttal Report) at 4.

115. *See Kahn v. Lynch Commc'n Sys., Inc.*, 669 A.2d 79, 85 (Del.1995); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del.1983).

116. For example, the College Booksellers transaction may well have been motivated by Riggio's desire to increase his personal liquidity.

117. *See* JX–589 (handwritten notes of Jennifer Daniels (Feb. 16, 2010)) (indicating that Riggio "has not gone out of his way to buy control of Barnes & Noble").

having had his brother serve as CEO for many years. Although, at bottom, the board's determination that cabining Leonard Riggio's holdings at the current level did not pose a threat was not unreasonable, it was a less than adroit way to have an important discussion—a discussion that should have occurred in an executive session with the Riggios and at least Zilavy, if not Del Giudice, absent.

From that strange interlude, the board turned to the question of whether Yucaipa remained a threat. Barshay recapped the reasons that the board had adopted the Rights Plan, and then discussed what had happened since then. First, Barshay noted that Yucaipa continued to buy Barnes & Noble shares, and had acquired nearly a 19% stake in the company.[118] Second, Barshay reported that Aletheia had bought over 17% of Barnes & Noble's stock.[119] Then he noted the parallel increase in both Yucaipa and Aletheia's stakes, and recounted the "ample evidence" that Aletheia followed Yucaipa's lead in making investment decisions.[120] But Barshay also noted that the board could not stop someone from successfully running a proxy contest.[121] After reviewing the board's fiduciary duties, Barshay advised that Yucaipa and Aletheia posed a threat to the company, and that the 20% threshold was a reasonable, non-preclusive response to that threat.[122] The board unanimously voted to reject Yucaipa's request to raise the Rights Plan's threshold to 37%.

The board also considered an amendment to the Rights Plan in response to a technical question raised in Burkle's January 26, 2010 letter. In that letter, Burkle had asked for a clarification as to how the Rights Plan applied to the shares held by Riggio and his brother Stephen Riggio.[123] Under Burkle's reading, the Riggios were allowed to acquire up to 50% of Barnes & Noble's stock before triggering the Rights Plan.[124] Although Barshay did not agree with Burkle's reading, he recommended that the board adopt an amendment to the Rights Plan to foreclose any interpretation that Riggio or one of his immediate family members was permitted to own more than the grandfathered level of shares.[125] Using a four-page slide deck and referencing a draft amendment that had been circulated among the directors before the February 16 meeting,[126] Barshay walked the board through the details of the proposed amendment. The board adopted the amendment, and sent Yucaipa a letter indicating that its request to buy a 37% stake had been denied, but that an amendment had been adopted that should alleviate any concern that the Riggios were permitted to acquire more of Barnes & Noble's stock, much less 50%.[127]

Burkle responded with yet another letter, which criticized the board for protecting the Riggio family's interests, requested further clarifications as to the terms of the Rights Plan, and asked for a meeting with Barnes & Noble's independent directors.[128]

118. *Id.*

119. *Id.*

120. *Id.*

121. *Id.*

122. *Id.*

123. JX–507.

124. *Id.*

125. JX–589.

126. JX–572 (email from Karen Allessandro to George Campbell et al. (Feb. 15, 2010)).

127. JX–596 (Barnes & Noble Form 8–K (Feb. 17, 2010)) at Ex. 99.1.

128. JX–615 (letter from Ronald Burkle to the Barnes & Noble Board (Feb. 25, 2010)).

In response, on March 29, 2010, Del Giudice and Higgins met with Burkle in New York City to discuss his concerns. At that meeting, Burkle recounted his vision for Barnes & Noble, including his ideas of a strategic partnership with HP or Microsoft, a revived "Best of Borders" strategy, and certain unspecified corporate governance changes.[129] In fact, Burkle told Del Giudice and Higgins that he had spoken to a top executive at HP about "things [HP] could do with Barnes & Noble," such as creating a virtual inventory.[130] Burkle also recommended that Barnes & Noble add three or four independent directors, who Burkle might suggest such as the HP executive. Although the testimony differs, it appears that Burkle was hedgy, both expressing a desire for his own picks while also suggesting a possible willingness to come up with a compromise group acceptable to himself and the Barnes & Noble independent directors.[131] What was clear is that Burkle hoped to reduce the number of Riggios on the board, and the number of Riggio allies. And, when pressed on Yucaipa's intentions, and specifically when told that the board did not want a "battle," Burkle did not give a direct response or make his demands more concrete.[132] The meeting adjourned, and Burkle and the board did not have further communications.

On May 5, 2010, Yucaipa filed this lawsuit, alleging that the board breached its fiduciary duties by adopting the Rights Plan and declining to amend it to Yucaipa's satisfaction.[133] After Yucaipa filed suit, the board approved a second amendment to the Rights Plan.[134] That amendment essentially changed the Rights Plan's definition of beneficial ownership to more strictly conform it to prior rights plans that have been upheld by Delaware courts, such as the one that was at issue in *Moran*,[135] and to 8 Del. C. § 203.[136] And, at trial, defense counsel offered an admission that "neither Barnes & Noble nor any of the other defendants intend[ed] to seek to enforce the definition of beneficial owner in its current rights plan any differently than that language is interpreted ... in ... other rights plans or in 8 *Del.Code*, Section 203."[137]

Yucaipa moved for expedited proceedings arguing that the Rights Plan was impeding its ability to run a proxy contest for the annual meeting to be held no later than September 30, 2010.[138] Indeed, Yucaipa claimed to be so balked by the Rights Plan that it could not even name a slate and begin a proxy contest, believing that it needed to cut deals with other stockholders about the shape of a slate and sharing of expenses before it could commit to spend money on a proxy contest.[139] Instead, it and the defendants devoted their substantial resources to preparing for an expedited four-day trial that was held on July 8, 9, 12, and 13, and post-trial briefing and argument, which was held on July 22,

---

129. Del Giudice Dep. at 262–63.

130. JX–653 (handwritten notes of Jennifer Daniels (Mar. 29, 2010)).

131. *Id.*

132. *Id.*

133. Compl. ¶¶ 79–128.

134. JX–778 (letter from Sandra C. Goldstein to counsel for Yucaipa (June 23, 2010)).

135. *Moran v. Household Int'l, Inc.,* 500 A.2d 1346 (Del.1985).

136. JX–778.

137. Tr. at 435–36.

138. Compl. ¶ 4.

139. Yucaipa Mot. to Expedite ¶¶ 6, 13, 30.

2010. In this opinion, I address the issues raised at that trial.

## III. *Legal Analysis*

Addressing Yucaipa's challenge to the Rights Plan is complicated by the evolving nature of Yucaipa's arguments and the multiple standards of review it advocates as being relevant to the consideration of its arguments.

To grapple with Yucaipa's arguments in a coherent way, I will proceed as follows. First, I will identify the standard of review that applies to determine whether the board's adoption and maintenance of the Rights Plan is in compliance with its fiduciary duties. Second, as a prelude to addressing whether the board has satisfied its fiduciary duties, I examine Yucaipa's argument that the Rights Plan is so ambiguous about the activities it proscribes that, for that reason alone, its maintenance must be deemed unreasonable or it must be interpreted to allow groups comprised of owners of over 20% of the shares to jointly run proxy contests without triggering a Rights issuance. Finally, I address the central issue of applying the appropriate standard of review, *i.e.,* the *Unocal* standard, to determine whether the board or Yucaipa prevails in this litigation.

## A. *Unocal Provides The Appropriate Standard Of Review In This Case*

Seeking to reverse decades of settled law, Yucaipa argues that the standard of review to evaluate whether the board's adoption and amendment of the Rights Plan complied with its fiduciary duties is subject not to the *Unocal* standard used in *Moran* and its progeny, but to either: (1) entire fairness review; or (2) *Blasius*'s "compelling justification" standard.[140]    I reject that argument for the following reasons.

### 1. *Entire Fairness Review Does Not Apply*

■ Yucaipa argues that the Rights Plan should be subject to entire fairness review because the Riggios, as the largest shareholder, stood on both sides of the transaction.[141]    But, other than grandfathering Riggio and his brother in their pre-existing stakes, the Rights Plan did not confer any special benefit on Riggio, or allow Riggio to obtain a majority stake in Barnes & Noble.[142]    Rather, Riggio was subjected to a new limitation, capping him at his existing stake subject to extremely limited exceptions.[143]    The decision of a

140.  *Cf. In re Unitrin S'holders Litig.,* 1994 WL 698483, at *4 (Del.Ch.1994) ("In choosing *Unocal* as the framework for reviewing the board's conduct, I reject plaintiffs' arguments that the entire fairness or *Revlon* [*Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173 (Del.1986)] standards apply to this case. The members of the board may have a personal interest in retaining the poison pill and continuing the repurchase program, but the intermediate standard of judicial scrutiny was designed to deal with this potential conflict."), *rev'd on other grounds,* 651 A.2d 1361 (Del.1995).

141.  *E.g., Kahn,* 638 A.2d at 1113–14 (discussing that the entire fairness standard of review applied to interested merger transactions between a controlling stockholder and a corporation).

142.  *See In re Primedia Inc., Deriv. Litig.,* 910 A.2d 248, 260–61 (Del.Ch.2006) (determining that the entire fairness standard would apply where a controlling shareholder received the benefit of a special dividend that was not shared with the rest of the corporation's shareholders).

143.  *See* Rights Plan § 1; JX–597 (Barnes & Noble 8–K regarding first amended rights plan (Feb. 17, 2010)) § 1.

board to adopt a rights plan that does not take the legally dubious and extreme step of stripping an existing equity holder of his existing equity stake but that restricts that holder to his existing level of ownership [144] and restricts others to a lower level is not the type of self-dealing transaction that invokes entire fairness.[145] If, as part of a searching *Unocal* review, it turns out that the board acted to entrench the grandfathered holder, then of course a fiduciary duty breach will be found, but the mere decision to grandfather an existing holder does not invoke the entire fairness standard.[146] Furthermore, the Rights Plan was approved by an independent board majority, thus invoking the business judgment rule standard anyway.[147]

### 2. The "Compelling Justification" Standard Under Blasius Does Not Apply

■ In the alternative, Yucaipa argues that the board must supply a "compelling justification" under *Blasius* for adopting the Rights Plan because that Plan was adopted for the improper purpose of disenfranchising the company's shareholders. Famously, and under very unusual facts, *Blasius* held that the board of directors must provide a "compelling justification" for its actions where the board acted "for the primary purpose of interfering with the effectiveness of a stockholder vote." [148] Thus, the trigger under *Blasius* is as extreme as the standard it invokes. By *Blasius*'s own terms, it only applies when directors "act[ ] for the primary purpose of thwarting the exercise of a shareholder vote." [149] Barnes & Noble argues that, on

144. The Rights Plan permits Riggio to receive additional equity-based compensation without triggering the Plan. *See* Rights Plan § 1 (permitting Riggio to acquire additional shares from the exercise of stock options or restricted stock under any employee benefit or compensation plan, issued before or after the adoption of the Rights Plan, without triggering the Plan). The Barnes & Noble board should expect investors and others, including this court, to view with great skepticism any grant of equity-based compensation to Leonard Riggio, who might be thought to already have an adequate incentive to increase the value of the company, and when any further substantial issuance could unfairly tilt the election process. In the unlikely event that the board masochistically decides to dive into a self-generated maelstrom of this kind, Yucaipa may obviously move for relief.

145. *See, e.g., In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 998–99 (Del.Ch.2007) (finding that a board's decision to leave in place a rights plan that grandfathered the company's CEO and largest stockholder, but to limit further purchases by that stockholder by a separate letter agreement, did not fall into the "range of self-interested transactions" (i.e., a variety of actual self-dealing transactions) that the court found were subject to the entire fairness standard).

146. *Cf. id.* at 1001–02 (finding that, absent a showing that a disinterested board failed to consent to the implementation of a rights plans, the decision of a board to exempt the CEO, who was a large stockholder and fellow board member, from a poison pill was subject to the business judgment rule, and concluding that the plaintiffs had the burden to plead that the board had acted irrationally and had failed to do so).

147. *E.g., Orman v. Cullman*, 794 A.2d 5, 22–24 (Del.Ch.2002) (explaining that the presumptions of the business judgment rule attach where a majority of the board is disinterested and independent); *see In re infoUSA*, 953 A.2d at 1001–02 (same).

148. *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 659 (Del.Ch.1988); *see* Leo E. Strine, Jr., *The Story of Blasius Industries v. Atlas Corp.: Keeping the Electoral Path To Takeovers Clear, in* Corporate Law Stories 243, 266–67 (J. Mark Ramseyer ed., 2009).

149. *Blasius*, 564 A.2d at 660; *see id. at* 659–62 (explaining that the "compelling justification" test applies where the board acted "for the primary purpose of interfering with the effectiveness of a stockholder vote," "for the primary purpose of preventing the effectiveness of a shareholder vote," "for the primary purpose of thwarting the exercise of a share-

the facts, Yucaipa has not shown that the board acted "for the primary purpose of interfering with the effectiveness of a corporate vote," [150] especially when the Rights Plan allows stockholders to acquire blocs of up to 20% and when Yucaipa admits that the Rights Plan is not preclusive of an effective proxy contest. Perhaps most importantly, Barnes & Noble argues that the Supreme Court's decision in *Moran* and this court's decision in *Stahl* hold that a rights plan such as the Plan under consideration here is to be addressed under *Unocal*'s intermediate review standard.

As to the first argument, I conclude that Barnes & Noble is correct. On this factual record, I cannot and do not conclude that the board acted with the primary purpose of disenfranchising Barnes & Noble's stockholders. Indeed, if it did so, it did so ineffectively. Rather, the board's motivation was to protect Barnes & Noble from the threat of being subject to inordinate influence or even control by a bloc that emerged without paying a fair price for that control. The effect on electoral rights was an incident to that end. Thus, because the Barnes & Noble board did not act "for the primary purpose of thwarting the exercise of a shareholder vote," *Blasius* does not apply by its own terms.[151]

The other reason that Barnes & Noble advances is also meritorious. The fact that the *Blasius* standard does not apply does not mean that that the inhibiting effect the pill has on a proxy contest is entitled to business judgment rule deference. Rather, the court must look closely at the operation of the pill to make sure that it does not unreasonably restrict the electoral rights of Yucaipa or other Barnes & Noble stockholders.[152] In fact, as Barnes & Noble admits, the board bears the burden to show that the pill is reasonable in this sense. That is, the board says it is settled law, per *Moran* and its progeny, that the *Unocal* standard of review applies. If, under that standard, the board proves that it, in good faith, reasonably determines that Yucaipa posed a threat and adopted a pill that reasonably addresses that threat and that does not preclude Yucaipa from waging an effective proxy contest, it, and not Yucaipa, prevails on the fiduciary duty issue.[153]

holder vote," "for the primary purpose of impeding the exercise of stockholder voting power," or "for the primary purpose of thwarting a shareholder vote"); *see also MM Companies, Inc. v. Liquid Audio, Inc.,* 813 A.2d 1118, 1130 (Del.2003) ("The 'compelling justification' standard set forth in *Blasius* is applied independently or within the *Unocal* standard only where the 'primary purpose of the board's action is to interfere with or impede exercise of the shareholder franchise and the shareholders are not given a full and fair opportunity to vote' effectively. Accordingly, this Court has noted that the non-deferential *Blasius* standard of enhanced judicial review, which imposes upon a board of directors the burden of demonstrating a compelling justification for such actions, is rarely applied either independently or within the *Unocal* standard of review." (quoting *Williams v. Geier,* 671 A.2d 1368, 1376 (Del. 1996))); *Stroud v. Grace,* 606 A.2d 75, 91 (Del.1992) (suggesting that *Blasius* applies when a "board[] of directors deliberately employ[s] various legal strategies either to frustrate or completely disenfranchise a shareholder vote," but that more incidental electoral effects should be examined under *Unocal*); *id.* at 92 n. 3 (suggesting that the compelling justification test only applies to defensive measures that "purposely disenfranchise stockholders"); *Unitrin,* 651 A.2d at 1379 (same).

150. *Blasius,* 564 A.2d at 661.

151. *Id.* at 660.

152. *See Stroud,* 606 A.2d at 91–92; *Unitrin,* 651 A.2d at 1379–80.

153. *See, e.g., Unitrin,* 1994 WL 698483, at *4; *see also City Capital Assoc. Ltd. P'ship v. Interco Inc.,* 551 A.2d 787, 790 (Del.Ch.1988) (stat-

To this binding precedent, Yucaipa employs a nuanced, if inaccurate, retort. To wit, Yucaipa claims that the Rights Plan at issue here is being employed for a novel purpose different from the rights plans at issue in *Moran* and *Stahl.* Yucaipa claims that in *Moran,* ·the Supreme Court was solely addressing the question of whether a 20% trigger in a rights plan limited the ability of a proxy contestant to buy shares and enhance their position in a proxy contest. Yucaipa claims that question is different from the question here, which is whether a rights plan can be used to prevent a stockholder such as Yucaipa from forming a coalition to jointly propose a slate and run a proxy contest to elect new directors.

Yucaipa's argument is baseless because it ignores that just that question was a key feature of the analysis in *Moran.* The fact is that the effect of a pill with a 20% trigger on the ability of insurgents to wage a joint proxy contest was a central issue in *Moran.* In that case, the plaintiff Moran's "first claim allege[d] that, [through the pill], a majority of Household's directors manipulated the corporate machinery to entrench themselves in office by restricting the shareholders' right to make use of the proxy machinery to gain control of Household." [154] And, in that case, the pill was triggered if a "person ... announce[d] the formation of a group of persons holding 20% to act together." [155] Indeed, the court explicitly noted that a "troublesome aspect of the Rights Plan is its potential restriction on proxy contests. The proxy inhibition arises because one of the events which trigger issuance of the preferred is the formation of a group representing 20% of Household stock for the purpose of conducting a proxy contest." [156]

In upholding the Household rights plan, the court found that although this restriction "deter[red] the formation of proxy efforts of a certain magnitude, it [did] not limit the voting power of individual shares." [157] Likewise, it settled a question that is raised here. The Household rights plan did not prohibit a holder of 20% from merely soliciting and receiving revocable proxies during a proxy contest.[158] A 20% holder (or group less than 20%) was free to propose a slate on its own, run a proxy contest, and solicit revocable proxies. What it could not do was to reach agreements with a group of holders owning over 20% to join together, form an agreed upon slate, and jointly fund and conduct a proxy contest.[159] Indeed, *Moran* dealt directly with the reason for that limitation. To wit, the court expressly recognized that the Rights Plan could not prevent a bidder from amassing sufficient voting power so as to vitiate the purpose of the pill in protecting the corporation's stockholders

ing that "the Supreme Court in *Moran* has directed us specifically to its decision in *Unocal* ... as supplying the appropriate legal framework [in the poison pill context]").

154. *Moran v. Household Int'l Inc.,* 490 A.2d 1059, 1070 (Del.Ch.1985).

155. *Id.* at 1066.

156. *Id.* at 1079–80 (stating that "the Plan extends the 20% triggering event to the formation of an ownership group, acting in concert for the purposes of a proxy contest"); *see also* Paul H. Edelman & Randall S. Thomas, *Resetting the Trigger on the Poison Pill: Selec-*

*tica's Unanticipated Consequences* 11 (Vanderbilt University Law School Law & Economics Working Paper No. 10–16, 2010), *available at* http://ssrn.com/abstract_id= 1631941 (recognizing that the pill's effect on the ability of Moran to win a proxy fight was a central issue in the *Moran* case).

157. *Moran,* 490 A.2d at 1080.

158. *Id.*

159. *Id.*

from an acquisition at an inadequate price or through coercion without covering concerted electoral action.[160] Accepting that premise, the court found that the application of the 20% trigger to joint action to propose a proxy contest was reasonable. Its ultimate finding was buttressed by the evidence that a single stockholder or group of stockholders owning up to the 20% limit could still wage a winnable proxy contest.[161]

On appeal, the Supreme Court affirmed this determination, plainly framing the issue:

> Appellants [contend] that the Board was unauthorized to fundamentally restrict stockholders' right to conduct a proxy contest. Appellants contend that the "20% trigger" effectively prevents any stockholder from first acquiring 20% or more shares before conducting a proxy contest and *further, it prevents stockholders from banding together into a group to solicit proxies if, collectively, they own 20% or more of the stock* .... The issue, then, is whether the restriction upon individuals or groups from first acquiring 20% of shares before waging a proxy contest fundamentally restricts stockholders' right to conduct a proxy contest.[162]

The Supreme Court then answered no to that question, block-quoting the Court of Chancery's reasoning and summarizing that:

> We conclude that there was sufficient evidence at trial to support the Vice-Chancellor's finding that the effect upon proxy contests will be minimal. Evidence at trial established that many

proxy contests are won with an insurgent ownership of less than 20%, and that very large holdings are no guarantee of success. There was also testimony that the key variable in proxy contest success is the merit of an insurgent's issues, not the size of his holdings.[163]

Indeed, in addressing the argument that the pill precluded a hostile acquisition of Household, the court justified its reasoning by noting that the pill was not a show stopper because a "group of up to 19.9% [could be formed to] solicit proxies for consent to remove the Board and redeem the Rights." [164]

Notably, Yucaipa's claim that it has no intention of making a bid for all of Barnes & Noble and is only interested in helping the company move toward a better, value-maximizing strategy through friendly cooperation echoes the *Moran* case, too. In that case, plaintiff Moran, who was a director of Household, disclaimed any interest in making a hostile bid.[165] But he had talked with a third-party about the potential for an acquisition of Household in a leveraged buyout, while claiming that he always viewed such an approach as requiring the cooperation of Household's management.[166] Here, Yucaipa, while disclaiming any willingness or interest in buying out all of the stockholders by paying a premium, admits to having brainstorming discussions with investment banks about taking Barnes & Noble private, and with HP about combining its assets with those of Barnes & Noble. And, in the Yucaipa 13Ds, Yucaipa indicat-

---

160. *Id.* at 1079–80.

161. *Id.*

162. *Moran,* 500 A.2d at 1355.

163. *Id.*

164. *Id.* at 1354.

165. *Moran,* 490 A.2d at 1065.

166. *Id.* at 1064–65.

ed that its options include an M & A transaction.

Similarly, in *Stahl*,[167] this court (specifically, *Blasius*'s author, Chancellor Allen) was asked to declare a poison pill invalid to the extent that the pill deemed any shares beneficially owned by:

[A]nother person solely by reason of any agreement, arrangement or understanding with such other person for:

a) the formation of and membership on a committee for the purpose of promoting or opposing any stockholder resolution or for nominating or electing a slate of nominees to the Board of Directors of [Bancorp] and/or service on such a slate of nominees and/or agreement to a slate of director nominees;

b) entry into revocable voting agreements or the granting or solicitation of revocable proxies with respect to the foregoing; and/or

c) the sharing of expenses and the indemnification against expenses and liabilities by any such other person with respect to expenses incurred or conduct occurring during the time such other person is a nominee or a member of such committee.[168]

Although the *Stahl* court's discussion of *Moran* borders on the obscure, its ultimate reading of *Moran* was that a rights plan could validly treat as beneficially owned all shares owned by those who had joined together to jointly propose and fund a proxy contest.[169] What *Moran* had made clear, *Stahl* says, is that a rights plan may not treat the mere receipt of a revocable proxy as constituting an agreement between the soliciting party and the proxy giver.[170] Of course, *Stahl* could hardly read *Moran* differently, because in *Moran* the Supreme Court affirmed the Court of Chancery in its entirety, the Court of Chancery had clearly understood the Household rights plan as treating as beneficially owned any shares subject to an agreement to jointly propose and fund a proxy contest, and because the Supreme Court's own words in *Moran* made clear that it was rejecting the argument that the Household rights plan was invalid because "it prevent[ed] stockholders from banding together into a group to solicit proxies if, collectively, they own 20% or more of the stock." [171]

After concluding that the Apple Bancorp rights plan was not facially invalid, the *Stahl* decision also concluded that, on the record before it, the plan's 30% trigger appeared to have been reasonably used to prevent a stockholder who already owned 30% from "forming a joint slate with other shareholders . . . ." [172] Thus, Chancellor Allen rejected in full the stockholder's request for summary judgment to enjoin the operation of the pill so as to enable him to reach agreements with other stockholders

---

167. *Stahl v. Apple Bancorp Inc.*, 1990 WL 114222 (Del.Ch. Aug.9, 1990).

168. *Id.* at *2.

169. *Id.* at *6–7.

170. *Id.*

171. *Moran*, 500 A.2d at 1355. Another Supreme Court decision makes clear that the Supreme Court itself understands *Moran* as having examined the effect of the Household pill's preclusion of the formation of groups of over 20% voting power for the purpose of jointly engaging in a proxy contest. *See Leonard Loventhal Account v. Hilton Hotels Corp.*, 780 A.2d 245, 246 (Del.2001) (reaffirming *Moran*'s status as good law and observing that in *Moran* "we held that the rights plan would not have the unauthorized effect of restricting stockholders' rights to conduct a proxy contest").

172. *Stahl*, 1990 WL 114222, at *8.

to conduct a proxy contest.[173]

To examine that question, Chancellor Allen expressly held that he viewed the question of whether a rights plan's use was an appropriate exercise of the board's fiduciary authority as being subject to review under the *Unocal* standard, rather than the standard of review that he created in *Blasius*. In concluding that *Unocal* applied, Chancellor Allen deferred to the Supreme Court's determination in *Moran* that *Unocal* was the appropriate standard of review.[174] But he also explained that the application of *Unocal* was appropriate because, although rights plans have an effect on the exercise of the stockholder franchise, the plan at issue did "not represent action taken for the primary purpose of interfering with the exercise of the shareholders' right to elect directors."[175]

Taken together, *Moran* and *Stahl* make the following clear. First, it is not at all unprecedented for a poison pill to restrict the ability of stockholders owning above a pill threshold of 20% from joining together as a group to finance and promote a joint slate through a proxy contest. Rather, the reasonableness of a board's decision to restrict the ability of stockholders to engage in such joint action has been a focus of poison pill litigation since the pill was invented. Second, it is settled law that the standard of review to be employed to address whether a poison pill is being exercised consistently with a board's fiduciary duties is the *Unocal*, not the *Blasius* standard. Although the Supreme Court and this court recognize that poison pills and certain other defenses affect the ability of stockholders to run proxy contests on an unfettered basis and that those effects should be closely examined when conducting a *Unocal* review,[176] the Supreme Court and this court have also recognized that pills such as those in *Moran* do not disenfranchise any stockholder in the sense of preventing them from freely voting and do not prevent a stockholder from soliciting revocable proxies.[177]

As a trial judge, I am also aware that a standard of review only has utility if it is actually the means by which a judge decides a case. In reality, if a board can meet its burden under *Unocal* to show that a rights plan is not unreasonable in the sense that its trigger is at such a reasonable threshold that the owner of a bloc up to the trigger level can effectively run a proxy contest, the pill would not work the type of disenfranchisement that both invokes *Blasius* review[178] and almost

173. *Id.*

174. *Id.* at *7.

175. *Id.*

176. *E.g., Moran,* 500 A.2d at 1355; *Stroud,* 606 A.2d at 91; *Unitrin,* 651 A.2d at 1379; *Mercier v. Inter–Tel (Delaware), Inc.,* 929 A.2d 786, 810–11 (Del.Ch.2007); *see also* William T. Allen, et al., *Function Over Form: A Reassessment of Standards of Review in Delaware Corporation Law,* 56 Bus. Law. 1287, 1316 (2001) ("The post-*Blasius* experience has shown that the *Unocal/Unitrin* analytical framework is fully adequate to capture the voting franchise concerns that animated *Blasius,* so long as the court applies *Unocal* with a gimlet eye out for inequitably motivated

electoral manipulations or for subjectively well-intentioned board action that has preclusive or coercive effects.") (citations omitted).

177. *See Unitrin,* 651 A.2d at 1383; *Stahl,* 1990 WL 114222, at *8; *Moran,* 490 A.2d at 1080.

178. "[T]he Delaware Supreme Court and this court have both recognized the high degree of overlap between the concerns animating the *Blasius* standard of review and those that animate *Unocal.*" *Chesapeake Corp. v. Shore,* 771 A.2d 293, 320 (Del.Ch.2000); *Stroud,* 606 A.2d at 92 n. 3; *Unitrin,* 651 A.2d at 1378–79; William T. Allen et al., *supra* note 176 at 1315 ("Once it was established [by cases applying the *Blasius* standard] that the law would

invariably signals a ruling for the plaintiff.[179] From the inception of pill litigation, a key feature of the *Unocal* review of the pill the Supreme Court requires is whether the pill unreasonably restricts the ability of stockholders to run a proxy contest. That is the mandated inquiry I must and now do undertake.

## B. Analysis Of Yucaipa's Challenge To The Rights Plan

### 1. Brief Summary Of The Unocal Standard

■ Under the familiar *Unocal* standard, adoption of a defensive measure will be protected by the business judgment rule so long as: (1) the board that adopts the measure in question had "reasonable grounds for believing that a danger to

corporate policy and effectiveness existed"; and (2) the "defensive response was reasonable in relation to the threat posed." [180] The Supreme Court's *Unitrin* decision helpfully emphasized the utility of the concepts of preclusion and coercion in addressing the question of whether a pill was an unreasonable response. Precisely because *Moran*'s approval of the pill was premised on the ability to get around the pill through a proxy contest, *Unitrin* recognized the importance of examining whether the company's defensive arsenal as a whole, including the pill, was preclusive in the precise sense of making it unrealistic for an insurgent to win a proxy contest.[181] Thus, this court has recognized that directors must "show that their actions were reasonable in relation to their

---

credit the board's justification for *some* actions that had the effect of delaying or arguably 'impeding' the vote, the structure of the *Blasius* analysis came to resemble very closely the structure of the *Unocal* analysis.... Since the early 1990s, the court of chancery and the Delaware supreme court began gradually to 'fold' the *Blasius* standard into *Unocal*, effectively making the former a subset of the latter."); *id.* at 1311–16 (reviewing the post-*Blasius* decisions and showing that they had first analyzed whether board action affecting the electoral process precluded a fair election, and, where it did not, the court held that *Blasius* did not apply; thus, the preclusion analysis essentially determined if the standard of review was *Blasius* and the outcome—that is, *Blasius* was not itself used as the prism for decision-making).

The decisions addressing the so-called "dead hand" poison pill demonstrate the overlap. A dead hand poison pill is rather obviously designed to impede a new board majority from having the ability to redeem a rights plan and thus creates an intentionally severe and extreme disincentive for the running of a proxy contest. Yet, in *Carmody v. Toll Bros, Inc.*, the court, in addressing a motion to dismiss, found that the dead hand pill was not only subject to likely proscription as a breach of fiduciary duties under *Blasius*, but was also likely to be found "disproportionate and unreasonable" under the *Unocal* standard, pre-

cisely because its effects on the election process were both preclusive and coercive. *See Carmody v. Toll Bros., Inc.*, 723 A.2d 1180, 1194–95 (Del.Ch. July 24, 1998).

179. *See Chesapeake*, 771 A.2d at 319–20, 322–23 ("In the wake of *Blasius*, Delaware courts have struggled with how broadly that case should be applied. In retrospect, this difficulty might have been anticipated. Because the test is so exacting—akin to that used to determine whether racial classifications are constitutional—whether it applies comes close to being outcome-determinative in itself. Therefore, in a moment of rather remarkable candor, the Delaware Supreme Court stated: the *Blasius* 'burden of demonstrating a "compelling justification" is quite onerous, and is therefore applied rarely.' ... In reality, invocation of the *Blasius* standard of review usually signals that the court will invalidate the board action under examination. Failure to invoke *Blasius*, conversely, typically indicates that the board action survived (or will survive) review under *Unocal*." (quoting *Williams*, 671 A.2d at 1376)).

180. *Unitrin*, 651 A.2d 1361, 1373 (Del.1995) (citing and summarizing *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del.1985)).

181. *Id.* at 1387.

legitimate objective, and did not preclude the stockholders from exercising their right to vote or coerce them into voting a particular way."[182] Even if a defense is not preclusive, the court must strike down the defense if the directors fail to persuade the court that that defense was within the "range of reasonableness."[183] That is, *Unitrin* left room for a determination that a non-preclusive, non-coercive defensive measure was nonetheless unreasonable in light of the threat faced by the corporation. As we shall soon see, this "range" comes into play in this case, according to Yucaipa.

### 2. Overview Of Yucaipa's Major Arguments Against The Use Of The Rights Plan

Yucaipa's arguments have had an evolving character. But in post-trial briefing, Yucaipa seems to have settled on two central theories.

The first is somewhat hard to pin down, and arguably sounds both in contract and in equity. This argument is premised on the assertion that the Rights Plan is ambiguous and thus unreasonably leaves Yucaipa and other stockholders without guidance as to what activities could trigger the issuance of Rights. Candidly, it is not clear exactly how Yucaipa relates this contract interpretation argument to its fiduciary duty claim. It can be conceived of as an aspect of Yucaipa's fiduciary duty claim, in the sense that Yucaipa claims that the Rights Plan is so unclearly drafted as to freeze all stockholder insurgents for fear of triggering a catastrophically dilutive Rights issuance. But the argument can also be seen as a request for a declaration that the beneficial ownership definition in the Rights Plan not be read as covering

---

**182.** *Mercier v. Inter–Tel (Del.), Inc.*, 929 A.2d 786, 810–11 (Del.Ch.2007). In examining the preclusiveness question, I do not adopt the view that a rights plan or other defensive measure is not preclusive if it merely leaves open a mathematical or theoretical possibility of winning a proxy contest. I understand that to be a possible reading of the *Unitrin* decision. *See Selectica, Inc. v. Versata Enterprises, Inc.*, 2010 WL 703062, at *22 (Del.Ch. Feb.26, 2010) ("The requirement of either the mathematical impossibility or realistic unattainability of a proxy contest reinforces the exactness of the preclusiveness standard. It is not enough that a defensive measure would make proxy contests more difficult—even considerably more difficult. To find a measure preclusive (and avoid the reasonableness inquiry altogether), the measure must render a successful proxy contest a near impossibility or else utterly moot, given the specific facts at hand."). In my view, if a defensive measure does not leave a proxy insurgent with a fair chance for victory, the mere fact that the insurgent might have some slight possibility of victory does not render the measure immune from judicial proscription as preclusive. In particular, if the terms of a rights plan, which already has the powerful effect of bar-

ring the direct door to an acquisition, in themselves have the effect of rendering a victory for an insurgent improbable, the proportionality prong of the *Unocal* test should require the board to make an extremely strong showing why the rights plan should be sustained. In other words, precisely because the Supreme Court's pill jurisprudence channels takeover battles into the electoral forum, it is critical that *Unocal* review of the effect of a pill on election contests be robust. When a pill both prevents a tender offer and unfairly tilts the electoral playing field against an insurgent, this court, to be true to *Moran*, should not hesitate to enjoin its operation. Here, though, as explained below, the Barnes & Noble Rights Plan does not unreasonably restrict Yucaipa's ability to run a proxy contest because, with the Rights Plan in place, Yucaipa has a fair chance to prevail and indeed is the likely favorite in a proxy contest.

**183.** *See Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 728 A.2d 25, 50–51 (Del.Ch. 1998) (enjoining a poison pill because, although the pill was not coercive or preclusive, it fell outside the range of reasonableness), *aff'd on different grounds*, 721 A.2d 1281 (Del. 1998).

agreements among holders of more than 20% of the shares on a slate of candidates, a platform for that slate, expense sharing, and the solicitation of proxies, so long as those holders retain the discretion to vote against the slate themselves.

Yucaipa's second primary argument is a more traditional one. Largely abandoning its contention that the Rights Plan is actually preclusive, Yucaipa argues that the Rights Plan is beyond the range of reasonable responses to any threat posed by Yucaipa. In particular, Yucaipa emphasizes that the large voting bloc owned by the Riggios and the company's directors and officers make the use of a 20% trigger unreasonable, because it unfairly and unreasonably tilts the electoral playing field against Yucaipa. Because Yucaipa now professes to only want to elect one-third of the board, has not announced any acquisition proposal, and has never before made a hostile proposal, Yucaipa claims it is unreasonable overkill for the Barnes & Noble board to prevent it from buying additional shares up to the level of Riggio's ownership or forming a coalition with other large investors to jointly run a proxy contest. Although Yucaipa acknowledges that the board's initial adoption of the Rights Plan might have been proper due to Yucaipa's rapid purchases, Yucaipa says the board has acted unreasonably in not lifting the pill to trigger at a level like 37%.

I address these two arguments in the following order. Because it is useful to have clarity about the application of the Rights Plan, I first address the contention that the Rights Plan is ambiguous and (i) is therefore unreasonable under *Unocal* for that reason, or (ii) should be interpreted as not preventing Yucaipa from agreeing to run a joint proxy contest with other investors who, along with Yucaipa, hold more than 20% of the company's shares. After considering that contention, I then address Yucaipa's more traditional *Unocal* argument.

### 3. The Rights Plan's Definition Of Beneficial Ownership Is Not Ambiguous

■ Yucaipa makes the argument that the beneficial ownership provision in the Rights Plan is ambiguous, and that the lack of clarity has unnerved Yucaipa to the point that it was chary to even discuss, much less agree to, a potential proxy slate with other Barnes & Noble investors. For this reason alone, Yucaipa, or so I glean, contends that the Rights Plan is unreasonable. That is, Yucaipa seems to argue that the words "agreement, arrangement or understanding" are ambiguous and provide Yucaipa and other investors no reliable guidance about what they can or cannot do without triggering the Rights Plan.

But Yucaipa's interpretation is an unreasonable one that is based on unrealistic and absurd premises. Thus, for reasons I will set forth next, I reject the argument that the Rights Plan is ambiguous, at least to the material extent that would be necessary to condemn it as unreasonable for that reason alone. Rather, as it now stands, the Rights Plan's trigger is based on a well-recognized standard, which sophisticated investors like Yucaipa must address as a regular course of doing business due to provisions like § 13(d) of the Securities Exchange Act of 1934 (the "Exchange Act") (§ 13D, for short),[184] and which has been the subject of many judicial rulings including in *Moran* itself.

---

**184.** Securities Exchange Act of 1934, ch. 404, § 13, 48 Stat. 894 (codified at 15 U.S.C. § 78a *et seq.*) ("Exchange Act").

For starters, let us consider the language of Paragraph (c) of the definition of beneficial ownership in the Rights Plan, which is what Yucaipa contends is ambiguous. As originally drafted, that language provided:

A Person shall be deemed the "Beneficial Owner" of, and shall be deemed to "beneficially own," and shall be deemed to have "Beneficial Ownership" of, any securities: . . .

(c) which are beneficially owned, directly or indirectly, by any other Person (or an Affiliate or Associate thereof) with which such Person (or any of such Person's Affiliates or Associates) has (i) any agreement, arrangement or understanding (written or oral) for the purpose of acquiring, holding, voting (except pursuant to a revocable proxy as described in the proviso to clause (b)(ii) of this definition) or disposing of any voting securities of the Company or *(ii) any agreement, arrangement or understanding (written or oral) to cooperate in obtaining, changing or influencing the control of the Company.*[185]

In response to Yucaipa's request for clarification of Paragraph (c), Cravath sent a letter to Yucaipa explaining the definition of beneficial ownership on May 11, 2010.[186] In that letter, Cravath stated:

Pursuant to the definition of "Beneficial Owner" in the Shareholder Rights Plan, [Yucaipa] would not trigger the Shareholder Rights Plan by, among other things: *(1) mounting a proxy contest by putting forth a slate of candidates for the upcoming Board election; (2) putting forth any proposals for shareholder consideration that [Yucaipa] wishes; (3) communicating his position regard-*

*ing any or other proposals to other shareholder fully and freely; and (4) soliciting and receiving revocable proxies in response to any public proxy solicitation made generally to all of the Company's shareholders.* Your client and his Affiliates and Associates would, however, trigger the Shareholder Rights Plan if: (1) they enter into any agreement, arrangement or understanding (written or oral) with any other shareholder for the purposes of acquiring, holding, voting (except pursuant to a revocable proxy as described above) or disposing of any voting security of the Company, or if they enter into any agreement, arrangement or understanding (written or oral) with any other shareholder to cooperate in obtaining, changing or influencing the control of the Company; and (2) the aggregate number of Shares Beneficially Owned by your client and such other shareholder and their Affiliates and Associates is 20% or more of the outstanding stock. *Thus, your client and his Affiliates and Associates would trigger the provisions of the Shareholder Rights Plan if they, along with any such shareholder, jointly share expenses of a proxy contest or propose a joint slate of directors.*[187]

And, on June 23, 2010, the Board amended the Rights Plan to remove provision (c)(ii) from the definition of beneficial ownership entirely. As amended, Paragraph (c) is as follows:

A Person shall be deemed the "Beneficial Owner" of, and shall be deemed to "beneficially own," and shall be deemed to have "Beneficial Ownership" of, any securities: . . .

---

**185.** Rights Plan § 1 (emphasis added).

**186.** JX–686 (letter from Sandra Goldstein to David Robbins (May 11, 2010)).

**187.** *Id.* (emphasis added).

(c) which are beneficially owned, directly or indirectly, by any other Person (or an Affiliate or Associate thereof) with which such Person (or any of such Person's Affiliates or Associates) has *any agreement, arrangement or understanding (written or oral) for the purpose of acquiring, holding, voting (except pursuant to a revocable proxy as described in the proviso to clause (b)(ii) of this definition) or disposing of any voting securities of the Company.*[188]

In an accompanying letter to Yucaipa explaining the amendment, Cravath wrote that "[t]here can be no question now that the terms of the Rights [Plan] do not foreclose" such things as "agreeing to talk or meet about a proxy contest, participating in forums or group calls discussing the candidates or grievances of the dissident, [and] having a regional or group meeting with other investors."[189]

Despite the clarification provided by the letters from Cravath and by the later amendment, Yucaipa nevertheless argues that the italicized language in Paragraph (c) immediately above is still so ambiguous that it has "an *in terrorem* effect because no one can be certain what conduct might trigger the Rights Plan."[190] The result, Burkle claimed at trial, was that the Rights Plan "absolutely" handicapped Yucaipa because "we aren't really allowed to talk to anybody."[191] Gregory Taxin, Yucaipa's expert, echoed that view: "[e]ven under the pill, as now worded, . . . I think lots of institutions would just take a pass and basically not take a meeting."[192] And, Daniel Burch, another of Yucaipa's ex-

perts, also testified that the Rights Plan's ambiguity inhibited Yucaipa from seeking revocable proxies, which made it "like tying both hands behind [Yucaipa's] back in a proxy contest."[193]

To the extent that it is based on the premise that Yucaipa is prevented from soliciting revocable proxies, Yucaipa's argument is itself unreasonable. First, and most importantly, the Plan itself expressly carves out seeking revocable proxies in Paragraph (c). And, the letter Cravath sent to Yucaipa on May 11, 2010 lists a number of activities, including seeking revocable proxies, that Barnes & Noble views as acceptable under the Rights Plan, including:

(1) [M]ounting a proxy contest by putting forth a slate of candidates for the upcoming Board election; (2) putting forth any proposals for shareholder consideration that [Yucaipa] wishes; (3) communicating his position regarding any or other proposals to other shareholder fully and freely; and (4) soliciting and receiving revocable proxies in response to any public proxy solicitation made generally to all of the Company's shareholders.[194]

Thus, the Rights Plan is clear that soliciting revocable proxies is allowed, and Barnes & Noble has clarified that additional activities will not trigger the Plan. Indeed, Burkle had conversations with Eichler of Aletheia—another Schedule 13D filer—after the Rights Plan was put in place, belying any claim that he was so paralyzed by the Rights Plan that he did

---

188. JX–781 (Second Amended Rights Plan (June 23, 2010)) § 1 (emphasis added).

189. JX–778 (letter from Sandra Goldstein to Stephen Alexander and David C. McBride (June 23, 2010)).

190. Yucaipa Pre-trial Op. Br. at 26.

191. Tr. at 54–55 (Burkle).

192. *Id.* at 352 (Taxin).

193. *Id.* at 618 (Burch).

194. JX–686.

not dare talk to any other Barnes & Noble stockholder.

Second, as amended, the definition of beneficial ownership in Paragraph (c) is no different than the language that has been incorporated into countless rights plans since *Moran*.[195] This court in *Moran* expressly noted the connection between the definition of beneficial ownership in the plan there and the definition under § 13D of the Exchange Act:

> [The rights plan] extends the 20% triggering event to the formation of an ownership group, acting in concert for the purposes of a proxy contest. The group concept and beneficial ownership have been admittedly borrowed from comparable provisions in federal regulations under Sections 13(d) and 14(d) of the Securities Exchange Act of 1934.[196]

Rule 13d–5, promulgated under § 13 of the Exchange Act, provides:

> When two or more persons agree to act together for the purpose of acquiring, holding, *voting* or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of Section 13(d) and (g) of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons.[197]

Thus, like the pill in *Moran*, the Rights Plan's definition of beneficial ownership is essentially identical in scope to Rule 13d–5. Furthermore, the definition of beneficial

ownership in *Stahl* was substantively identical to the definition here. The *Stahl* rights plan provided that a shareholder is deemed to own any shares "which are beneficially owned, directly or indirectly, by any other person with which such person or any such person's affiliates has any agreement, arrangement or understanding . . . for the purpose of acquiring, holding, voting or disposing of any securities of the [Company]," [198] and the *Stahl* court presumed, as did the parties, that that language unambiguously circumscribed the Apple Bancorp shareholders' ability to reach agreements regarding the joint conduct of a proxy contest.[199]

Both *Moran* and *Stahl* also upheld those rights plans on the basis that they allowed shareholders to seek revocable proxies. Thus, because the Rights Plan here uses substantively identical language to the pills in *Moran* and *Stahl* and explicitly allows the solicitation of revocable proxies, there is no question that Paragraph (c) of the Rights Plan permits Yucaipa to solicit revocable proxies.

The beneficial ownership provision of the Rights Plan is clear: it says shareholders cannot have agreements, arrangements, or understandings relating to the voting of shares, except that it allows shareholders to seek revocable proxies. Indeed, Yucaipa's expert, Taxin, testified that § 13D group voting restrictions are "very well understood by institutional in-

---

**195.** Taxin and Burch, Yucaipa's experts, admitted as much. *See* Tr. at 426 (Taxin) ("Q. . . . The definition of beneficial ownership presently in Barnes & Noble's rights plan appears in hundreds of other rights plans; correct? A. Yes, I believe it does."); Burch Dep. at 72 ("Q. And so if you read the current poison pill, is the definition of beneficial owner unusual in any way? A. Not that I'm aware of. Q. It's a standard definition, correct? A. I believe it is, yes.").

**196.** *Moran*, 490 A.2d at 1080.

**197.** 17 C.F.R. § 240.13d–5(b)(1) (emphasis added).

**198.** *Stahl*, 1990 WL 114222, at *3.

**199.** *Id.* ("No one has argued contract interpretation. Rather both sides have assumed the language covers the activities in question and for purposes of this motion so will I.").

vestors,"[200] and that an interpretation of the beneficial ownership provision as consistent with the scope of the rules promulgated under § 13D would "make it most understood or understandable to investors."[201]

Yucaipa nevertheless attempts to escape the plain reading of the amended Rights Plan through the creative, if ultimately unconvincing, argument that the Plan is nevertheless unclear because it does not expressly say that agreements for the "purpose of . . . voting" include a "non-binding expression of intent to vote for the slate that may be revoked the next day."[202] In other words, Yucaipa says that it should be allowed to do the following: (1) reach an agreement with Aletheia about a slate of candidates that they will jointly vote for and the platform on which those candidates will run; (2) agree with Aletheia to share expenses arising from the ensuing proxy contest; (3) craft a joint strategy with Aletheia to win that proxy contest; and (4) then go out to other stockholders and jointly solicit their votes for their joint slate. According to Yucaipa, the reason that this will not constitute an "agreement, arrangement or understanding" is because Burkle and Eichler will say to each other that each reserves the right—irrespective of having agreed on the candidates, the platform, the strategy, and having sought other investors' votes on the premise that electing the slate is something they wish to do—to change his mind and ultimately vote against the slate! Here is how this goes down:

> Burkle: I want myself, Warren Buffett, and Jimmy Buffett, and the guy from HP.

Eichler: I buy a lot of that but not the ukulele player. I want to be on the slate.

Burkle: Will you support a slate of the guy from HP, Jimmy Buffett, you and me?

Eichler: Yes, depending on our message.

Burkle: Do you agree that X and Y is our platform?

> [After long discussion.]

Eichler: Yes, subject to the features we just discussed.

Burkle: Can we go halfsies on expenses?

Eichler: Based on this slate and platform, yes.

Burkle: We will work together to secure the votes?

Eichler: Yes.

Burkle: But we both understand that we reserve the right to vote against our slate, right? I mean just because we have formed a slate, agreed on an electoral platform, will share the costs of solicitation, and will recommend that the other stockholders give us proxies, we are not agreeing that Yucaipa and Aletheia will vote the same way as the folks whose votes we secured? That is understood, isn't it?

Eichler: Yes, we have that understanding regarding voting.

Yucaipa attempts to support its claim that the Rights Plan does not expressly address that situation by pointing to the deposition testimony of a few of Barnes & Noble's directors in which the deponents

**200.** Tr. at 334–35 (Taxin); *see also* Edelman & Thomas, *supra* note 156, at 31 ("[An] activist fund itself will generally have a relatively small stake in the targeted firm, and will studiously avoid engaging in any type of conversation with other investors to avoid creat-

ing a 'group' whose holdings would exceed the trigger level of the poison pill.").

**201.** Tr. at 376–77 (Taxin).

**202.** Yucaipa's Post-trial Op. Br. at 12.

struggle to conclude whether certain hypothetical situations would trigger the Rights Plan under Paragraph (c). For example, after being presented with the hypothetical of whether Yucaipa and another stockholder reaching an agreement on three potential nominees that they would like to approach to be on a joint slate was a breach of the amended Rights Plan, Zilavy replied "I don't know that—I don't know that that is allowed in this plan."[203] If the board itself cannot even parse out the meaning of the Rights Plan, so Yucaipa's theory goes, then surely the Plan must be ambiguous.

But, although some directors admittedly had difficulty interpreting the Rights Plan, that is understandable because it is a complex agreement, regardless of its use of language common to other rights plans and to § 13D. In other words, that members of the board could not immediately reach firm conclusions when asked convoluted questions about how Paragraph (c) applied to various hypothetical situations does not mean that the Rights Plan is unreasonably ambiguous and acts as a barrier to proxy insurgents who, by necessity, must follow analogous legal requirements like § 13D.

More importantly, Yucaipa is not really complaining about any ambiguity. The defendants clearly view the agreement that Yucaipa seeks to have with Aletheia as being within the meaning of the phrase "agreement, arrangement or understanding . . . for the purpose of . . . voting . . . any voting securities of the Company."[204]

In this regard, I find the defendants' argument to be the only sensible, real world reading of the Rights Plan's definition of beneficial ownership. Yucaipa conjures up a totally bizarre scenario in which there is no understanding about "voting" because of cute word play. When two stockholders jointly develop a slate and platform, jointly agree to run and finance a proxy contest, and ask others to vote for that slate, they are reasonably deemed to have also reached an agreement as to voting for the slate. All the Yucaipa witnesses' testimony confesses this reality: Burkle and Burch both say that Yucaipa wants to dicker with Aletheia so they can shape a slate and platform that Aletheia will support— not just by financing a proxy contest, but in the less extreme and more mundane sense of *voting* for that slate.[205] Moreover, Yucaipa's witnesses admit that this scenario will trigger § 13D disclosure requirements.[206] It may be that the beneficial ownership provision, when so read is substantively unreasonable under *Unocal*, but that is a different argument than that the definition does not clearly reach these arrangements. Rather, as was the case in *Moran*, the definition of beneficial ownership addresses the type of agreement Yucaipa seeks to reach with Aletheia.[207] At bottom, Yucaipa is simply positing an absurd scenario, at best fit for a discussion by a Red Bull fueled group of nerdy second year law school corporate law junkies, who find themselves dateless (big surprise) on yet another Saturday night. A corporate board is not required to conjure up every hypothetical situation imaginable

---

203. Tr. at 140–41 (Zilavy); *id.* at 145–48 (excerpt from Higgins' deposition, responding to a hypothetical question that she "would have to look toward [her] advisors in that regard").

204. Rights Plan § 1.

205. Tr. at 62–63, 109–110 (Burkle), 654–56 (Burch).

206. Tr. at 411 (Taxin), 626, 650 (Burch).

207. *See Moran,* 490 A.2d at 1080 (finding that the 20% trigger in the rights plan extended to "the formation of an ownership group, acting in concert for the purposes of a proxy contest").

and reduce it to writing in order to create a plainly drafted rights plan. Indeed, the Barnes & Noble board has taken pains, in the form of amendments to the Rights Plan and clarifying letters to Yucaipa, to address Yucaipa's particular concerns.

Furthermore, Yucaipa's claim that it wants to solicit proxies based on a "nonbinding" agreement with Aletheia is curious at best. If Yucaipa and Aletheia are genuinely—as opposed to pretextually—unsure if they will ultimately vote for their own slate, they would seem to be poorly positioned to win a proxy contest. Proxy fight letters are pitches for a cause, and tend towards emphatic language in order to sway shareholders to the dissident's side. The idea that Yucaipa and Aletheia are going to convince others to vote for directors for whom they themselves do not intend to vote is fanciful. More logically, when stockholders compose and then nominate a slate of directors and jointly ask others to vote for that slate, they agree, as an instrumental matter to their disclosed joint end of electing that slate, to vote for that slate themselves. For that reason, groups seeking proxies commonly refer to the candidates they are seeking to elect using the possessive "our," such as "[o]ur experienced director nominees."[208] To un-

dertake the serious step of making a proxy solicitation without a genuine belief in one's statements to the solicitees may hazard non-frivolous securities fraud litigation.[209] At best, if one assumes real world incentives, such a reservation of any understanding about "voting" is simply in this scenario a pretext to avoid compliance with § 13D, which is a pretext that neither the law nor the Barnes & Noble Rights Plan needs to treat as genuine.

### 4. The Board Did Not Breach Its Fiduciary Duties By Adopting The Rights Plan

Having addressed Yucaipa's contention that the Rights Plan is ambiguous, I now address its argument that the Rights Plan is substantively unreasonable in its effect. In its initial complaint, Yucaipa asserted that the board failed as to both of *Unocal*'s prongs—that is, the board did not have reasonable grounds for believing there was a threat to Barnes & Noble, and the Rights Plan was not a proportional response to that perceived threat because it precluded shareholders from voting.[210] But, by the time of post-trial argument, Yucaipa's argument had narrowed in two important respects. First, Yucaipa abandoned its argument that there was never a

208. *See, e.g.,* Allied Research Corporation, Schedule 14A (May 21, 1999) ("We are writing to seek your support for *our* five directornominees, who are standing for election to the Board of Directors of Allied Research Corporation in opposition to the management nominees at the Company's upcoming Annual Meeting on June 9, 1999. After you review the biographies of *our* director-nominees, we think you will agree that they possess the strong business experience and knowledge . . . necessary to help maximize Allied Research's shareholder value.") (emphasis added); Biogen Idex Inc., Schedule 14A (May 15, 2009) ("*Our* experienced director nominees successfully helped effect change at ImClone Systems which resulted in substantial value creation.") (emphasis added).

209. See 17 C.F.R. § 240.14a–9 (prohibiting proxy solicitation "by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading"); see also Exchange Act § 14(a) (creating an implied private right of action for misleading or fraudulent proxy statements).

210. Compl. ¶ 82.

legitimate threat to Barnes & Noble.[211] In doing so, it acknowledged that the rapidity of Yucaipa's purchase of Barnes & Noble's stock and its expressed intention to acquire up to 50% of Barnes & Noble's shares gave the board a reasonable basis to adopt the Rights Plan at the November 17 meeting. Thus, it has narrowed its focus to arguing that once the situation was stabilized, it was unreasonable not to amend the Rights Plan, per Burkle's request, to allow Yucaipa to buy up to 37% of the company's stock. And, as important, Yucaipa now concedes that the Rights Plan does not preclude it from running a successful proxy contest in the sense that Yucaipa acknowledges that it is realistically possible for it to prevail despite the Rights Plan and the shares held by the Riggios, the rest of the board, and Barnes & Noble's employees.[212]

Despite having now conceded that the board was faced with a legitimate threat, and that the Rights Plan was not preclusive, Yucaipa asserts that the Rights Plan is nevertheless disproportionate because it does not fall within the residual "range of reasonableness" test articulated in *Unitrin*.[213] Yucaipa bases this argument on the following creative theory: first, although there was an initial threat to the company, that threat somehow receded or became clearer over time; and second, even though the Rights Plan is not preclusive, keeping it in place without amending it in the ways requested by Burkle is unreasonable in light of the more confined threat that Yucaipa poses. That is, Yucaipa argues that once the immediate danger of further purchases by Yucaipa was addressed, there was no threat to Barnes & Noble that justified leaving the trigger for the Rights Plan at 20%, rather than raising it, as Burkle proposed, to 37%, the total voting power of the Riggios, the rest of the board, and Barnes & Noble's stockholding employees. In addition, Yucaipa says that no threat justified applying the Rights Plan to cover discussions and agreements between Yucaipa and Aletheia regarding the selection and financing of a proxy slate.

a. *Although Its Process Was Not Ideal, The Board Made A Good Faith And Reasonable Determination That Yucaipa Posed A Threat*

■ The *Unocal* test has two related prongs, as is well known. I will address both of them. But, as a prelude to addressing whether the Barnes & Noble directors have shown that they made a good faith, reasonable judgment that the company faced a threat to which the Rights Plan was a reasonable, proportionate response, I address a key motivational issue. In assessing this question, I do not ignore the reality that Leonard Riggio has unique reasons to find the emergence of other large blocholders as a threat to himself, a threat that is different from those that legitimately concern the company itself. For a variety of reasons, Riggio as a founder may not want his baby under the control of someone else, particularly Bur-

---

211. *See* Yucaipa Pre-trial Ans. Br. at 11 ("[Barnes & Noble] argue[s] there was a need for a Rights Plan, but that has never been the issue in this litigation."); *Yucaipa v. Riggio et al.*, C.A. No. 5465–VCS, at 118 (Del.Ch. July 22, 2010) (TRANSCRIPT) ("The Court: ... The first meeting, you would admit, they had [a] fairly compelling reason to do something fast. [Yucaipa Counsel]: I understand the argument that they needed to act promptly.

The Court: Because, otherwise, your client could, you know, keep buying; right? [Yucaipa Counsel]: Yes.").

212. *See id.* at 62 ("The Court: ... You would admit that it is not preclusive? [Yucaipa Counsel]: Yes.").

213. *Unitrin*, 651 A.2d at 1388.

kle. That said, I have considered the board's less than fully adroit process and its relationship to Riggio in making my determinations. Without relying on any "material enhancement" for the presence of a bare independent board majority,[214] I am persuaded that the independent board members and lead director Del Giudice acted in good faith and for reasons unrelated to the perpetuation of Riggio as the largest stockholder of Barnes & Noble. No doubt the board, and its advisors, could have done a better job in excluding Riggio, his brother Stephen, and Zilavy at key moments when Riggio's own motivations and interests were under consideration. The process was not ideal. But overall, I am convinced that the board acted loyally, in the sense of trying to advance the best interests of the company and its public stockholders, and not those of Riggio. The board was also appropriately informed, and its outside legal advisors consistently kept the board focused on their duty to avoid precluding the ability of Yucaipa or other holders from mounting an effective proxy contest. Indeed, the board took action that constrained Riggio in an important way from addressing the threat of a proxy contest by making market purchases to secure voting control. Therefore, as I address the related questions of whether the board acted to address a legitimate threat and responded proportionately to that threat, I do so having been convinced by the defendants of the good faith of the board majority.

With that in mind, I now address the question of whether the Barnes & Noble board was responding to a legitimate threat. Yucaipa frames its argument that it poses no serious threat in a very convenient and self-serving way. Although Yucaipa must acknowledge that there is nothing novel about a rights plan's trigger applying to agreements between stockholders to run a joint proxy slate, and that a trigger of 20% has been held to be reasonable on several prior occasions, Yucaipa emphasizes that its case is distinct because all it seeks to do is to elect three directors this year, not a controlling slate, and that it has not announced a tender offer to acquire all the company's shares and has never made a hostile tender offer in its prior investing history. All Yucaipa desires, it says, is to have a little voice, in the form of electing three new directors, and therefore to apply to it the full force of a traditional rights plan designed to address a bidder for control is unreasonable.

The problems with this argument are several. For starters, the argument ignores the reality that the election of three directors to a classified board is not a trifling event, which gives the prevailing party no influence. Although much has been made of the minor number of instances in which a classified board has impeded a committed acquirer willing to pay an

---

**214.** Under *Unocal*, where defensive measures are taken by a majority of independent directors, proof of the board's good faith and reasonable investigation is "materially enhanced." *See Unocal*, 493 A.2d at 955. A number of factors here incline me not to rely on the material enhancement feature of the test. First, there is a bare majority of independent directors on the board. Second, the board did not form an independent committee or even excuse other directors like Riggio from the room during part of the discussions when considering whether to adopt the Rights Plan. Thus, the bare independent board majority never engaged in any separate deliberations. And, finally, although the lead advisor guiding the board, Cravath, was independent and acted so, other advisors like Morgan Stanley and Bryan Cave had prior roles in advising Riggio on the College Booksellers transaction and on personal matters that rendered them poorly suited to play a role in this situation. Therefore, I do not rely on any material enhancement booster in concluding that the board has demonstrated its compliance with its fiduciary duties.

attractive price,[215] the reality is that even the combination of a classified board and a rights plan are hardly show-stoppers in a vibrant American M & A market.[216] Once an insurgent has won one election, the incumbent board majority's ability to be intransigent in the face of stockholder sentiment is greatly limited.[217]

215. An excellent article by Professors Subramanian, Coates and Bebchuk, called *The Powerful Antitakeover Force of Staggered Boards: Theory, Evidence, and Policy*, addresses this subject. 54 Stan. L.Rev. 887 (2002). As support for the argument that the potent combination of a poison pill and an effective staggered board ("ESB") should invoke very strict judicial inquiry, they observe that as of 2002:

only five hostile bidders ever[ ] have won a first proxy contest conducted over their bid against an ESB: Moore against Wallace Computer, Carson Pirie Scott against Younkers, U.S. Surgical against Circon; Boston Bank of Commerce against Carver Bancorp; and Weyerhaeuser against Willamette. Among these five bids, one was eventually sold to the initial bidder (Willamette), two were sold to another bidder within a few months after the hostile bidder withdrew (Circon and Younkers), and two (Wallace Computer and Carver Bancorp) remained independent after losing a first proxy contest.

*Id.* at 947–48.

But, as the distinguished authors themselves admit, while 60% of ESB targets remained independent nine months after the initial bid, only 47% of ESB targets remained independent after thirty months. *See id.* at 930, 933; *see also* Thomas W. Bates, et al., *Board Classification and Managerial Entrenchment: Evidence from the Market for Corporate Control*, 87 J. of Fin. Econ. 656, 665–66, 675 (2008) (finding that "[t]arget board classification does not change the likelihood that a firm, once targeted, is ultimately acquired. Moreover, shareholders of targets with a classified board realize bid returns that are equivalent to those targets with a single class of directors, but receive a higher proportion of total bid surplus. Board classification does reduce the likelihood of receiving a takeover bid, however, the economic effect of bid deterrence on the value of the firm is quite small. Overall, the evidence is inconsistent with the conventional wisdom that board classification is an anti-takeover device that facilitates managerial entrenchment."); Martin Lipton, *Pills, Polls and Professors Redux*, 69 U. Chi. L.Rev. 1037, 1059 (2002) ("In very few instances has a target with a staggered board suffered a first-round loss—had a third of the board replaced with the raider's nominees—and continued to refuse to surrender its independence. In all other cases, after a first-round loss, or even before, when it became clear that the shareholders would vote to replace a third of the board, the target negotiated a deal."); John C. Coates IV, *Takeover Defenses in the Shadow of the Pill: A Critique of the Scientific Evidence*, 79 Tex. L.Rev. 271, 328–29 (2000) (citing studies that have found that defensive measures, including classified boards and poison pills, do not deter bids). In fact, in Weyerhaeuser's bid for Willamette Industries, Weyerhaeuser won its first proxy contest after bidding $50 per share. Faced with a second proxy contest, however, the incumbent Willamette majority agreed to sell the company when Weyerhaeuser voluntarily raised its bid to $55.50 per share. *See* Mark Gordon, *Response Symposium: Takeover Defenses Work. Is That Such a Bad Thing?*, 55 Stan. L.Rev. 819, 834–35 (2002); *see also id.* at 823–24 (arguing that Subramanian et al. understate the benefits of ESBs to shareholders by focusing only on hostile takeovers instead of all takeovers where ESBs are involved, and noting that ESBs can provide bargaining leverage for a company engaged in friendly takeover discussions).

216. *Cf.* John C. Coates IV, *M & A Break Fees: US Litigation v. UK Regulation* 13–15 (Harvard Public Law Working Paper No. 09–57, 2010) (finding that both the premiums paid and the incidence of M & A transactions were, on a statistically significant basis, higher in the United States than in the United Kingdom).

217. *See* 1 Arthur Fleischer, Jr. & Alexander R. Sussman, Takeover Defenses: Mergers and Acquisitions § 6.05[A] at 6–34 (6th ed. 2010) ("[A] bidder that acquires a majority of the voting power of a company . . . may be able to effect changes in the company's bylaws, such as requiring unanimous approval for certain board actions . . . [to] harass the directors and seek to limit their activities.").

And in this case, Yucaipa also has not only the challenge, but also the opportunity, to make a more important point. Although only three directors are up for reelection at the next Barnes & Noble annual meeting, these directors include the founder and Chairman, Leonard Riggio himself, the lead independent director Del Giudice, and Riggio's personal financial advisor, Zilavy. Thus, Yucaipa can make it a referendum about whether the future of the company should follow Riggio's vision or the vision Yucaipa articulates. This is a high-stakes contest, no doubt, but one in which Yucaipa, if it can make a convincing case, can come out of the election with great influence. The potency Yucaipa would gain by winning is also enhanced by the fact that the Rights Plan will be put to a vote this calendar year.[218] If Yucaipa wins a proxy contest, the incumbent board, while having the legal authority to adopt a new pill if the shareholders vote not to renew the Rights Plan, would by doing so be walking with open eyes right into a whirling helicopter blade.

Another major and related problem with Yucaipa's argument is that its portrayal of itself as an "aw shucks, purely friendly" investor is at odds with its own behavior and public disclosures. The first indication of the potential threat came when Burkle, who had recently purchased a 5% stake in Barnes & Noble through Yucaipa, wrote to Riggio, expressing his disappointment that Barnes & Noble had purchased College Booksellers. Riggio knew, after the Bowery Meeting, that Burkle had his own ideas for Barnes & Noble, and was therefore alerted to the possibility that Burkle would take action after receiving Burkle's August 2009 letter criticizing the College Booksellers transaction as a bad move for the company. At that meeting,

Burkle also disclosed that he had spoken with Pershing's Ackman about Barnes & Noble, suggesting that Burkle was operating within a network of other large investor activists. Any suspicion that Riggio or the board had about Burkle's intentions was confirmed in November 2009, when Burkle more than doubled Yucaipa's stake in Barnes & Noble to 17% in just four days and published the Yucaipa 13Ds publicly criticizing the policies of the Barnes & Noble board and management. In those 13Ds, Yucaipa also reserved for itself the right to: (1) make a proposal to acquire all of Barnes & Noble's shares; and (2) propose other M & A transactions involving Barnes & Noble. Indeed, in its HSR filing when it was rapidly accumulating Barnes & Noble shares on the open market, Yucaipa indicated that it might buy up to 50% of Barnes & Noble's shares. More specifically, the record makes clear that Yucaipa's leader, Burkle, has pondered various fundamental strategy changes for Barnes & Noble, including: (1) making major asset purchases from Borders, Barnes & Noble's major rival; (2) a joint venture with HP to introduce Barnes & Noble into the consumer electronics market; and (3) a going private transaction. Burkle was serious enough about these options that he took meetings with key HP executives and investment bankers, and the board was entitled to view him as having an interest in exploring these and the other options the Yucaipa 13Ds left open. In sum, the board had a reasonable basis to conclude that Burkle was potentially planning to acquire a controlling stake in Barnes & Noble, or form a governing bloc with another large stockholder like Aletheia, in order to put his own policies in place.

In that respect, Burkle's apparent interest in advancing strategic options for

---

218. Def's Pre-trial Ex. 23 (Barnes & Noble, Inc. Form 8–K (Nov. 17, 2009 Press Release)); Tr. at 245 (Higgins), 989 (Del Giudice).

Barnes & Noble did not stop when the Rights Plan was adopted. First, Burkle's December 23, 2009 letter to Riggio announced Burkle's own self-proclaimed view that he was at "war" with Riggio,[219] which, according to Riggio, was evidence that Burkle was "not going to go away" and that a proxy contest was a real possibility.[220] Indeed, Burkle continued to purchase Barnes & Noble stock for Yucaipa, raising Yucaipa's total ownership to 18.7%. At the same time, Eichler, who had followed Burkle's lead in several other investments, nearly tripled the stake that his company, Aletheia, had in Barnes & Noble and became a Schedule 13D filer, alerting the board to the possibility that Burkle and Eichler could team up to take control of the company. That Burkle and Eichler took a meeting on the same day that Burkle shot off his private letter to Riggio complaining about the College Booksellers deal,[221] and met again after the Rights Plan was in place, are events that I, being neither Goober Pyle or Kenneth Parcell, believe were anything but coincidental and had everything to do with Barnes & Noble. Thus, the board was faced with not only the threat of a proxy contest by Burkle, but also of Burkle and Eichler combining forces to influence Barnes & Noble's business strategy, including by the possible proposal of an M & A transaction.

On this record, I have no reason to conclude that Yucaipa would consciously propose options that would injure others for its own profits.[222] But that is hardly the measure of whether a board such as Barnes & Noble's might put in place a rights plan to address the threat that Yucaipa might pose. Despite its protestations, Yucaipa's prior investing history is replete with the sorts of investments that often lead to transactions in which public stockholders are treated differently. Although Yucaipa seems to have mostly entered on friendly terms, the terms it extracted have often given it control rights not available more generally to stockholders and its influence has resulted in important managerial changes.[223] To this point, it is reasonable to infer that the leveraged buyout options that Burkle pondered with investment banks regarding Barnes & Noble would have involved Yucaipa remaining as an equity investor and the other stockholders being cashed out. Indeed, it appears that Yucaipa prefers private company investments and would enjoy the chance to be an investor in a private Barnes & Noble.[224]

219. JX–457.

220. JX–468 (handwritten notes of Jennifer Daniels (Jan. 6, 2010)).

221. Tr. at 80 (Burkle).

222. Although Yucaipa and Burkle have, as any humans do, a less than flawless record, *see* Tr. at 103 (Burkle) (discussing that Yucaipa had to pay the City of Los Angeles after a legal battle over its investment with Yucaipa), the record as a whole suggests that Burkle is a well-respected investor, welcomed by many management teams as a partner, and, like Riggio, also seems to devote a good deal of time and resources to charitable and political initiatives that he genuinely and altruistically believes will make this a better world. That is, this is not at all a "bad person" case. If anything, the trial record portrays both Burkle and Riggio as intelligent, successful men who have done socially valuable things. Even such persons may, when given power and when having interests not aligned with others, pose a threat. *See City Capital Assoc.*, 551 A.2d at 796 ("*Unocal* recognizes that human nature may incline *even one acting in subjective good faith* to rationalize as right that which is merely personally beneficial."). Burkle's own view that Riggio has too much influence at Barnes & Noble admits this.

223. Tr. at 103–08, 128–30 (Burkle).

224. *Id.* at 7–8.

No doubt our law provides substantial protections for other investors in the event that a large stockholder with board representation proposes a going private transaction or engages in other forms of unfair value extraction,[225] but that does not mean that the Barnes & Noble board was not entitled to take reasonable, non-preclusive action to ensure that an activist investor like Yucaipa did not amass, either singularly or in concert with another large stockholder, an effective control bloc that would allow it to make proposals under conditions in which it wielded great leverage to seek advantage for itself at the expense of other investors. Precisely by cabining Yucaipa at a substantial, but not overwhelming, level of voting influence, the board preserved for itself greater authority to protect the company's public stockholders.[226]

In this same vein, Yucaipa's constant disclaimer of any willingness or intent to buy the company as a whole does not, in my view, undercut the reasonableness of the board's determination that Yucaipa posed a threat. Indeed, the fact that Yu-

caipa has not made a bid for the company is in some ways the point. In Burkle's stinging letters to Riggio, Burkle himself raises many of the plausible concerns regarding the problems that arise when a large blocholder is able to exert influence through several board seats and the potential that the blocholder will use that influence to advance its own self-interest, consciously or unconsciously, in a manner that is adverse to the company's other owners.[227] The board was not required to assume that Yucaipa is an angelic investor whose actions, unlike that of other humans, are immune from the temptation to act selfishly, especially when there is a record that Yucaipa has negotiated for itself special protections in connection with others of its investments and has reserved to itself the right to take Barnes & Noble private. Rather, the board could reasonably assume that Yucaipa, like other profit-seeking investors, might pose a danger to other company investors if it, in concert with a party like Aletheia, obtained strong unilateral control over a major portion of the company's voting securities.[228] Like-

225. *See, e.g., Kahn,* 638 A.2d at 1117; *Weinberger,* 457 A.2d at 703–04; *In re Loral Space and Commc'ns Inc.,* 2008 WL 4293781, at *31–32 (Del.Ch. Sept. 19, 2008).

226. In *Moran,* this court and our Supreme Court both recognized that unless the trigger on a rights plan applied to agreements between various stockholders, the protective utility of the rights plan would be easily evaded. *See Moran,* 490 A.2d at 1080; 500 A.2d at 1354. Here, it would be easy for Yucaipa and Aletheia to obtain majority voting control if the Rights Plan were amended to have a trigger of 37% and if the Rights Plan was not interpreted to prevent two 37% holders from coming together to propose a joint slate for election and to jointly fund a proxy contest.

227. *See* JX–457 (letter from Ronald Burkle to Leonard Riggio (Dec. 23, 2009)) at 2 (expressing Burkle's view that the board should evaluate options "in which all shareholders can participate" because "[o]ptions that increase

shareholder risk, but allow [Riggio] as controlling shareholder to decrease [his risk] by, among other things, cashing out, are not acceptable for a public company").

228. *Cf.* The Federalist No. 51 (James Madison) ("But the great security against a gradual concentration of the several powers in the same department, consists in giving to those who administer each department the necessary constitutional means and personal motives to resist encroachments of the others. The provision for defense must in this, as in all other cases, be made commensurate to the danger of attack. Ambition must be made to counteract ambition. The interest of the man must be connected with the constitutional rights of the place. It may be a reflection on human nature, that such devices should be necessary to control the abuses of government. But what is government itself, but the greatest of all reflections on human nature? If men were angels, no government would be

wise, the board could reasonably conclude that Yucaipa should deal with the board in the first instance if it wished to obtain such a bloc, and to pay a price to the company's investors that reflected the value of obtaining that power.[229]

Furthermore, if true, Yucaipa's disclaimer that it does not intend to buy the company also reinforces a concern that the board harbored and that is one that has been the subject of legislative concern in the European Union.[230] That is, the board was concerned that Yucaipa could, along with Aletheia as an admiring and devoted fellow traveler, essentially form a control bloc without paying a control premium. Wielding effective voting control, Yucaipa

and Aletheia could then propose options, such as a leveraged buyout in which they remained as controlling stockholders, that might be less attractive to the company's other stockholders than would either the status quo or the sale of the company in an open shopping process. Contrary to Yucaipa's view, I do not believe that this concern is at all unreasonable. In the United Kingdom and more generally in the EU nations that have embraced the EU Takeover Directive, a stockholder who acquires 30% of the shares of a public company is required to make a bid to acquire the shares of all of the holders of the company's stock at a price at least equal to the highest price paid for the same securities by the bidder.[231] The concern behind

---

necessary. If angels were to govern men, neither external nor internal controls on government would be necessary. In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself. A dependence on the people is, no doubt, the primary control on the government; but experience has taught mankind the necessity of auxiliary precautions.").

**229.** As noted previously, *see supra* n. 215, there is a plausible argument that a rights plan could be considered preclusive, based on an examination of real world market considerations, when a bidder who makes an all shares, structurally non-coercive offer has: (1) won a proxy contest for a third of the seats of a classified board; (2) is not able to proceed with its tender offer for another year because the incumbent board majority will not redeem the rights as to the offer; and (3) is required to take all the various economic risks that would come with maintaining the bid for another year. *See* Bebchuk et al., *supra* n. 215 at 946 (arguing that managers who lose an election over an outstanding bid should not be allowed to further block the bid by combining a pill with an "effective staggered board," and suggesting that "unless managers are allowed to use a pill-ESB combination to force only one election rather than two, the pill-ESB combination becomes preclusive"); *see also* Leo E. Strine, Jr., *The*

*Professorial Bear Hug: The ESB Proposal As a Conscious Effort to Make the Delaware Courts Confront the Basic "Just Say No" Question,* 55 STAN. L.REV. 863, 877–79 (2002) (questioning whether the continued use of a pill could ever be deemed preclusive if it is considered non-preclusive to maintain a pill after a bidder has won an election for seats on an ESB). But, such acts of resistance when a bidder has won one proxy contest appear to be rare, *see* Gordon, *supra* n. 215 at 834 (observing that there are "very few examples" of incumbent directors holding out against a hostile bid after the bidder won the first round of elections), and in this case, if Yucaipa were to propose a bid, the Rights Plan is subject to a stockholder vote before the end of this year.

**230.** *See* Directive 2004/25/EC of the European Parliament and of the Council of 21 April 2004 on Takeover Bids (the "EU Takeover Directive").

**231.** *See id.* Art. 5 §§ 1, 4 (requiring that a bidder who acquires "a specified percentage of voting rights in [a] company" make a bid for all holdings of the remaining shareholders at "[t]he highest price paid for the same securities by the offeror ... of not less than six months and not more than 12 before the bid"); UK Takeover Code Rules 9.1, 9.5 (requiring that a stockholder who acquires 30% of a public company make a bid for the shares of all other stockholders of that company at a price no less than the highest price paid for

this Directive is that if a party is going to achieve such a potent level of voting power, it should have to offer to all stockholders the chance to sell on fair terms. In this regard, the board was entitled to consider Burkle to be an ordinary human, susceptible to self-interest, and not to assume that he was an angel.

Admittedly, here, the question is complicated by the pre-existing presence of the Riggios' substantial bloc. But that reality does not undermine the reasonableness of the board's concern that without a limit on open market purchases by Yucaipa and others at a level below the level of the Riggios' range, a control bloc could emerge

the same securities by the bidder in the prior 12 months); Freshfields Bruckhaus Deringer, *Implementing the Takeover Directive in the EU,* July 2006, *available at* http://www. freshfields.com/publications/pdfs/2006/Take overDirective.pdf (reporting that Spain, the Netherlands, Italy, Germany and Austria have implemented mandatory bid requirements with a 30% trigger).

**232.** Under the terms of Aletheia's Investment Management Agreement, proxies will be voted in accordance with the Investment Manager's Proxy Voting Policy. JX–794 § 13. Although this document declares that "[i]t is the general policy of Aletheia Research and Management, Inc. to not vote client proxies," JX–138, Part II, the company expressly "reserves the right to depart from these guidelines in order to avoid voting decisions that [it believes] may be contrary to [its] clients' best interests." *Id.* The policy states that, if it had to cast proxy votes, it would do so "in the interest of maximizing shareholder value." *Id.* But that is not the only issue over which Aletheia would consider casting proxies. It would "withhold votes for directors that fail to act on key issues such as failure to submit a rights plan to a shareholder vote," and "oppose proposals . . . if the purpose or effect of which is to entrench management or dilute shareholder ownership." *Id.* at Part II.A. Importantly, in its Schedule 13D regarding its investment in Barnes & Noble, Aletheia says that it has voting authority over its shares, a disclosure that, if false, could subject Aletheia to fraud liability. DX–561 (Aletheia Schedule 13D (Feb. 9, 2010)).

that did not pay a control premium. The fact that both Yucaipa and Aletheia acquired nearly 40% of Barnes & Noble's shares in open market purchases makes the point. And although Aletheia pitches itself as a bit of a mystery, the most logical economic rationale for its *huge* investment in Barnes & Noble is that Aletheia hoped to reap gains from some fundamental strategy change that would produce a materially higher stock price and, having accumulated a large bloc of shares that could be the swing vote in an election, Aletheia will act to ensure that those shares are used in the way that Aletheia believes will maximize its return.[232] Indeed, although

When questioned about its policies and whether Aletheia had ever voted its shares, Eichler stated that while the general policy is to not vote proxies, "[Aletheia] *may* have upon occasion." Eichler Dep. at 131–32 (emphasis added). Furthermore, there is strong reason to believe Eichler would vote his shares for Yucaipa's slate because Eichler is an avowed admirer of Burkle. *See, e.g.,* DX–496 (e-mail from Eichler to a potential investor describing the merits of purchasing Barnes & Noble stock, including that it is "the # 1 retail brand in America" and that there was "substantial buying from one of the most successful investors in the world [sic] Ron Burkle, who now owns almost 20% of the company"). And, Eichler acknowledged that a proxy fight would be beneficial for Aletheia even if they did not gain representation on Barnes & Noble's board, which leads to a reasonable inference that Aletheia would cast its proxy votes in Yucaipa's favor. JX–530 (email from Peter Eichler to Shane Murrish (Feb. 2, 2010)) (noting that Burkle was starting a proxy fight at Barnes & Noble and that "it should be great for the stock"). Finally, Yucaipa's own expert, Burch, testified that he "would assume that a very sophisticated investor with a large bloc like [Aletheia] would probably vote for [Yucaipa]." Tr. at 584 (Burch).

Federal law also buttresses the inference that Aletheia's bloc will be voted. Because of the large bloc of Barnes & Noble stock bought by Aletheia on behalf of its clients, Aletheia's strategy of following activists into investments, and the federal ERISA policies, it is

its Schedule 13D said that Aletheia had "no plans or proposals" that would result in an "extraordinary corporate transaction" involving Barnes & Noble, the Schedule 13D also expressly noted that "Aletheia however reserves the right, at a later date, to effect one or more of such changes or transactions." [233] Moreover, it is clear that Aletheia's Eichler is a big admirer of Burkle and that there is a strong possibility for the immediate formation of a control bloc if the Rights Plan were not in place.

Although Yucaipa dismisses the notion, it is possible that, absent the Rights Plan, Barnes & Noble could find itself in a situation where the Riggios increased their voting power substantially in response to Yucaipa and Aletheia open market purchases, resulting in a situation when the remaining public stockholders (such as holders of index funds that might not sell into the market if Barnes & Noble remained, as it now is, a public company) were relegated to a minority. In such a scenario, either Yucaipa or Aletheia might actually be the ones who sell out, or the company could end up with three large blocholders having acquired their stock for less than might have been paid to the more dispersed Barnes & Noble investors had the company been sold in a process run by the board. I do not pretend to have the capacity to tease out what results such an open market free-for-all would have for Barnes & Noble's smaller investors, but I do believe it was reasonable for the board to fear that the outcome would be less desirable than if a rights plan cabined the situation. In so finding, I also reject the notion that the board could have easily dealt with that

situation by simply limiting purchases by the Riggios, and allowing others to freely buy up to their level. Although it was, as I next examine, critical that the board consider the voting power held by the Riggios in designing the Rights Plan, I do not find it unreasonable for the board to consider it difficult or even unfair to impose a new purchase restriction on the company's founder, Leonard Riggio, while leaving it open to Yucaipa and Aletheia to make market purchases that would leave them jointly with a voting majority.

b.  *The Rights Plan Was A Proportional Response To The Threat The Company Faced*

█ To a large extent, Yucaipa's threat and proportionality arguments bleed together, and the effect of that intermingling is evident now because part of the proportionality analysis I undertake here has already been answered by my finding above that the threat from Yucaipa and Aletheia remains a proper basis for board concern. What is left is the related question of whether the Rights Plan is a reasonable response to that ongoing threat.

Here, the key issue is whether the Rights Plan unreasonably inhibits the ability of Yucaipa to run an effective proxy contest. In addressing that question, it is of course critical to confront the reality that the Riggios own nearly 30% of Barnes & Noble's outstanding stock, the rest of the board and the officers owns another 3.26%, and the Barnes & Noble employees own another 6%. Although I am dubious that it is appropriate to treat the employ-

---

almost unimaginable that Aletheia's stock, if still held, would not be voted in a high-stakes proxy contest at Barnes & Noble. The ERISA mandate that regulated investment funds have informed voting policies or face liability for breach of fiduciary duties has had a huge effect in increasing the saliency of voting and

the rise of proxy advisory firms like Risk Metrics. 29 C.F.R. 2550.404c–1 (ERISA § 404(c)) § (b)(2)(B)(iv).

**233.** DX–453 (Aletheia Schedule 13D (Dec. 22, 2009)).

ees as a part of a management bloc,[234] and although I recognize that the other directors' equity holdings might give them a self-interest under certain conditions to break with Riggio, I accept for present purposes the notion that in a contested proxy contest the shares held by the board, company officers, and employees will be voted for the slate the board proposes.[235] Thus, I accept the basic idea—which the board's and Yucaipa's experts agree upon—that the management slate would go into a proxy fight in which a turnout of around 91% is expected, with around 37% to 38% of the expected vote.[236] Therefore, to win, Yucaipa would have to garner a strong super-majority of the remaining vote to get a majority. That is obviously a lift. But it is not a herculean lift. It is one that a reasonably fit proxy fighter can pull off, especially if it can get nearly half of the necessary votes just from one other stockholder, Aletheia.

Indeed, Yucaipa now admits that the Rights Plan is not preclusive. The Rights Plan is not preclusive because, as Yucaipa's own experts indicated, there is good reason to believe that Yucaipa will succeed in a proxy contest if it puts together a platform and a slate of candidates that are attractive to Aletheia and the leading institutional proxy advisors, particularly Risk Metrics.[237] Although Burkle acted at trial

---

**234.** Both Yucaipa's expert, Daniel Burch, and the defendants' expert, Peter Harkins, assumed for purposes of their preclusion analysis that shares over which non-director and non-officer employees of Barnes & Noble have voting authority—which are held through 401(k) plans and in the form of restricted stock—would be voted overwhelmingly for management. Because it is not necessary to my decision, I can remain agnostic over the question of whether "employees" should be lumped in unthinkingly with directors and officers. To do so and to treat employees as an undifferentiated mass who are not entitled to vote their own self-interest seems questionable. Although it may be true that many employees will vote for the devil they know, that may be because they are more skeptical of plans that involve notions like cutting capital investment in order to increase stock buybacks. They may view such plans as perhaps beneficial to those who wish to make a quick pop off of the company's stock but not to those who are looking to the company to produce long-term sustainable wealth. It is also simplistic to ignore the reality that there are all types of employees at different stages of their careers and lives, and that these employees are not blindly devoted to the corporation's top managers, but will vote their self-interest as they perceive it. Why employee-stockholders, of all stockholders, would be deemed disqualified from doing so is not an idea the equity of which is readily apparent. Given that many corporate governance commentators have long wanted to give employees an incentive to act like owners, to say that employees are not entitled to do so when the question is who should govern the corporation would seem, well, a tad contradictory.

But, even with the extremely Yucaipa-friendly assumption that employees vote in a lemming like way for Barnes & Nobles' management slate, an assumption I do not accept, I still find that Yucaipa has a potent ability to succeed in a proxy contest.

**235.** In *Unitrin*, there is reasoning that suggests that votes in the hands of a united board were available to an insurgent in a proxy fight. *See Unitrin*, 651 A.2d at 1380–81 (stating that "it cannot be presumed that the prestige and perquisites of holding a director's office or a motive to strengthen collective power prevails over a stockholder-director's economic interest"). That reasoning is strained. It may be that directors with shares might come to the conclusion to make a deal with an insurgent by, for example, reaching acquisition terms or adding additional board members. *That is different than the notion that directors will vote against themselves at the polls.*

**236.** *See* Burch Report at 10; Harkins Report at 9; JX 783 (Rebuttal Report of Daniel H. Burch) at 3.

**237.** *See* Tr. at 720 (Harkins) ("I think they have got better than a 50–50 chance."), 585–86 (Burch) ("You know, barring unforeseen things, I think, you know, we have a better

like he had no idea what other investors would find attractive, that testimony was implausible.[238] He knows that other investors will want to see that an insurgent slate has a plausible strategy by which to increase the value of Barnes & Noble's shares. Burkle, who caused Yucaipa to pay approximately $166 million to buy 18% of Barnes & Noble, obviously has a strong view that there are means by which Barnes & Noble can produce a value justifying a market price higher than he paid. Indeed he has several such ideas. Burkle, who has access to advice from very savvy proxy solicitors and who has substantial market experience, also realizes that a slate comprised of persons with relevant and successful business experience (e.g., in retailing and technology) will do better than a slate with professors and so-called "professional directors." As will be discussed, Yucaipa admits that if it gets the support of Risk Metrics, it will likely win, as it is difficult to imagine a situation where Yucaipa gets Risk Metrics' support and does not also get Aletheia's. The policies of Risk Metrics about contests for a minority of the board help Yucaipa, as they make short slates easier to elect.[239] Risk Metrics also makes plain that it looks at nominees' strategic plans and business expertise.[240] For these reasons, it is plain that Yucaipa can win and is indeed perhaps a favorite in a proxy fight for three members of Barnes & Noble's board. Certainly, Yucaipa is not precluded by the

Rights Plan from running a successful campaign—rather, its merits case will be the key. In that light, it is also noteworthy that all of the experts in this case agreed that Risk Metrics was much more likely to support an insurgent slate than the management slate.[241]

Thus, Yucaipa's expert Daniel Burch testified as to the Rights Plan's preclusiveness as follows:

> Q. You don't believe that Barnes & Noble's rights plan, as now amended, makes a successful proxy contest by Yucaipa a mathematical impossibility, do you?
>
> A. No, I don't believe it makes it a mathematical impossibility.
>
> Q. You don't believe that Barnes & Noble's rights plan, as now amended, makes a successful proxy contest by Yucaipa realistically unattainable, do you?
>
> A. No, I don't.[242]

Barnes & Noble's expert, Peter Harkins, echoed that testimony:

> Q. Mr. Harkins, in your opinion, is it mathematically possible for Yucaipa to win in a proxy contest for the election of directors to Barnes & Noble's board this fall?
>
> A. Yes, I think it is, and I think everyone agrees that it is.
>
> Q. In your opinion, is it also realistically attainable?

shot at winning than not."); Yucaipa Post–Trial Ans. Br. at 18 ("Yucaipa does not dispute that it has a realistic possibility of winning a proxy contest.").

238. Tr. at 61–63 (Burkle).

239. *Id.* at 132–33 (Burkle), 711–13 (Harkins).

240. *See* Risk Metrics U.S. Corporate Governance Policy 18 (2009), *available at* http://www.riskmetrics.com/sites/default/files/RMG

2009SummaryGuidelinesUnitedStates.pdf (stating that Risk Metrics will vote case-by-case for directors nominated in a proxy contest, looking at criteria such as "[q]ualifications of director nominees" and "[s]trategic plan of dissident slate and quality of critique against management.").

241. Tr. at 405–06 (Taxin), 656–58 (Burch), 711–13 (Harkins).

242. *Id.* at 681–82 (Burch).

A. Yes, I believe it is realistically attainable, and I think I've demonstrated that fact in my report—in the rebuttal report. I think the plaintiff's experts and I are in agreement with respect to at least two scenarios where they would win.[243]

The reasons why Yucaipa can prevail despite the Riggios' bloc are several.

First, the Rights Plan cap of 20% is high and allows Yucaipa to ensure itself 20% of the vote. Relatedly, that cap allows Aletheia to purchase up to 20% itself.[244]

Second, if, as is clearly possible and even likely, Aletheia supports a Yucaipa slate that advocates a plausible value-maximizing platform and is comprised of distinguished business persons, Yucaipa almost

---

**243.** *Id.* at 720–21 (Harkins).

**244.** Yucaipa argues that unless this court enjoins the Barnes & Noble Rights Plan and lets it form a group with Aletheia wielding nearly 40% of the vote, this court will somehow be undermining recent amendments to the DGCL, which make plain that which had always been understood by most Delaware corporate lawyers, which is that the stockholders of Delaware corporations have the authority to adopt potent bylaws shaping a more competitive election process. Sections 112 and 113 of the DGCL give stockholders the chance to shape their own company-specific approach to issues like proxy access and to require the corporation to reimburse even a losing proxy insurgent for expenses. *See* 8 Del. C. §§ 112, 113. There is no evident clash between these statutes and the Barnes & Noble Rights Plan. For starters, the very premise of a reimbursement bylaw, if adopted, undercuts the idea that a 20% holder needs to club up to fund a proxy contest, as the reimbursement feature would minimize any cost justification. Moreover, the main thrust of thinking around these issues does not involve the odd notion that someone like Yucaipa, who has taken a non-diversified risk and invested hundreds of millions of dollars, needs an incentive to run a proxy contest costing a mere fraction of its investment. Rather, the idea has been to give smaller holders an ability to run proxy contests because of the reality that their small holdings may make it unjustifiable to do so. By setting the trigger at a level of 20%, the Barnes & Noble board allowed a group of say, six 3% holders or nine 2% holders, to join together and pool expenses.

Although there are important reasons to be suspicious of a pill with a low trigger level, say the 4.99% in the *Selectica* case now being examined in litigation, that is triggered by an "agreement[ ], arrangement[ ], or understanding[ ] . . . for the purpose of . . . voting," a 20% trigger does not have the same inhibiting effect precisely because it allows a group of holders with substantial stakes such as Yucaipa or Aletheia to work together, so long as their combined clout does not exceed 20%. *See Selectica,* 2010 WL 703062, at *7; Rights Plan § 1. In unique situations where a company faces some other threat from ownership purchases (e.g., the loss of tax benefits), it may well be required that a more nuanced version of a pill be adopted that distinguishes more finely between shares that are owned in the more common sense by a stockholder, and those "beneficially owned" in the broader sense of being subject to "agreements, arrangements or understandings . . . for the purpose of . . . voting." Rights Plan § 1. To address legitimate threats in a reasonable way, it may be that a pill with a double trigger would be in order to limit direct holdings of a stockholder to say, less than 5%, but permit such holders to enter into "agreements, arrangements or understandings" of up to a higher threshold, say 20%. Although this would not address all concerns, *see* Edelman & Thomas, *supra* note 156 at 32–33 (noting the concern that a 5% pill can act as an unreasonable inhibition to strategic acquirers and therefore be adverse to the interests of target investors and society more generally), it would diminish the effect of such a pill on the ability of investors to join together and run a proxy contest.

Finally, precisely because the Barnes & Noble stockholders have not adopted any electoral system under 8 *Del. C.* § 112, there is no occasion to address what would occur if a stockholder-adopted bylaw under § 112 was undercut by a board-adopted rights plan. Indeed, in this case, the Barnes & Noble Rights Plan is subject to stockholder ratification this year.

immediately levels, if not exceeds, the Riggio advantage.[245]

Third, and importantly, all of the experts in the case make a point that might make the object of their commentary blush. All say that one of the key factors in the outcome of a proxy contest will be the recommendation of the firms that provide institutional investors with recommendations about how to vote, the so-called "proxy advisory firms," and in particular, one such firm, Risk Metrics Group Inc. (which was formerly known as Institutional Shareholders Services, and after its recent acquisition by MSCI, Inc. is apparently re-adopting the name "ISS"). Although Risk Metrics often disclaims that its clients blindly follow its recommendations,[246] the reputable proxy solicitors who testified in this case both agree that Risk Metrics exercises a great deal of influence

**245.** In one of its ever-growing and ever-changing list of arguments, Yucaipa argues that the Rights Plan is unreasonable because it restricts Yucaipa from forming a group of holders of more than 20% of the company's stock but also leaves the Barnes & Noble board free, in its official capacity, to enter into understandings with holders of more than 20% of the shares. It is not at all clear what Yucaipa believes the Barnes & Noble board could do in this regard. By its plain terms, the Rights Plan restricts the Riggios, in their capacity as stockholders, from forming such a group, and thus they could not be party to any such arrangements in the sense of committing their voting power. It is, I suppose, possible to think that the Barnes & Noble board might engage in back and forth with holders during the proxy solicitation process that would raise the potential for improper quid pro quos. *See Portnoy v. Cryo–Cell Int'l, Inc.*, 940 A.2d 43, 71–73 (Del.Ch.2008).

But, critically, any understandings the board would reach would be subject to the requirement that those understandings be in the best interests of the company and its stockholders, and not for the personal benefit of the board. *See id.* at 66–67; *see also Hewlett v. Hewlett–Packard Co.*, 2002 WL 549137, at *4 (Del.Ch. Apr. 8, 2002) (noting that there are fiduciary constraints on the ability of the management slate to seek proxies using inducements). To the extent the board, for example, sought to act as an instrument to protect the Riggios rather than for a proper purpose, they would be acting disloyally. That is, the board owes fiduciary duties to the company, something Yucaipa, as a stockholder, generally does not. *See, e.g., Ivanhoe Partners v. Newmont Min. Corp.*, 535 A.2d 1334, 1344 (Del.1987) ("Under Delaware law a shareholder owes a fiduciary duty only if it owns a majority interest in or exercises con-

trol over the business affairs of the corporation." (citing *Unocal*, 493 A.2d at 958)).

In addition, the board would be subject to powerful disclosure requirements that would require them to come clean if they were making bargains. *See Stroud*, 606 A.2d at 84 ("Under Delaware law … directors generally have a fiduciary duty to disclose all material facts when they seek stockholder action or communicate with stockholders."); *see also* Exchange Act Rule 10b–5 (codified as 17 C.F.R. § 240) ("It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails of any facility of any national securities exchange … [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made … not misleading…."). Put simply, given that the Rights Plan clearly restricts the Riggios from increasing their clout through arrangements in the same manner Yucaipa is constrained, and given that the concern that the Barnes & Noble board would, in some unspecified way, make improper bargains in support of the management slate is tempered by the constraints of fiduciary duty and disclosure law, this argument does not persuade me that the Rights Plan is being used unreasonably. Indeed, the most likely bargain the board would make is one with Yucaipa itself which it reached an accommodation with it to settle any proxy contest, the type of accommodation that has become increasingly common.

**246.** *See, e.g.,* Robert D. Hershey, Jr., *A Little Industry with a Lot of Sway on Proxy Votes*, N.Y. TIMES, June 18, 2006, at 6 (quoting Jamie Heard, vice chairman and part owner of Institutional Shareholders Services (ISS), who declared that the client " 'always has the final word' " and that the notion " 'that institutions are just blindly following [ISS]' is false").

over the vote of many of its clients and that these clients often hold an important part of the available vote in contests.[247] Although one should not overestimate their influence, nor can anyone in politics ignore the reality that if someone controls a key swing bloc of, say 5% to 10% of the vote, one has real influence.[248] In this case, the record is such that both Yucaipa and the defendants agree that the two most important factors in the outcome of any proxy contest between Yucaipa and Barnes & Noble's management slate will be the vote of Aletheia and the recommendation of Risk Metrics.

In the latter respect, one important aspect of Yucaipa's argument lacks force. Precisely because Risk Metrics and other proxy advisors give advice that their clients are free to accept or reject, Yucaipa has made no showing that the Rights Plan inhibits any discussions Yucaipa might have with Risk Metrics, Glass Lewis, and Proxy Governance, Inc. about Barnes & Noble, the qualities they look for in directors, and the considerations that they take into account in evaluating whether to support an insurgent slate. Indeed, as noted previously, many of these firms publish documents that give insight into some of their general views on these subjects.[249] To the extent, therefore, that Yucaipa, which made a large investment into Barnes & Noble, has a leader who has noodled over several business strategies for the company, and has already likely spent the equivalent of the total cost of a well-funded proxy contest to litigate this case, actually feels a genuine inhibition about pushing a slate without receiving some feedback from other parties with clout in the electoral process, there appears to be no barrier to it to talking to some of the most potent players. Precisely because Risk Metrics and Glass Lewis do not have voting control over any shares but simply give advice, neither they nor Yucaipa would seem to be at any risk to trigger the Rights Plan. Perhaps for that reason, Burkle has actually already met with Risk Metrics to discuss Barnes & Noble.[250] Admittedly, because the key

247. *See* Tr. at 405–06 (Taxin), 656–58 (Burch), 711–13 (Harkins).

248. The power of a small voting bloc is greatly enhanced by a favorable set of recommendations from Risk Metrics, which is "able to sway up to 30 percent of the vote in any particular proxy contest." Stephen J. Choi, et al., *Director Elections and the Role of Proxy Advisors*, 82 S. Cal. L.Rev. 649, 657 (2009) (noting that a number of developments, including recent calls for greater shareholder activism, "increase the potential importance of the shareholder franchise and thereby increase the potential effect of the proxy advisory firms that influence the manner in which shareholders vote"); Edelman & Thomas, *supra* note 156, at 36 ("Voting recommendations by ISS are viewed as influential, if not determinative, in proxy contests.... Institutional investors overwhelmingly use the services of ISS and the other third party voting advisors, and empirical research as shown that ISS's recommendations have an impact on the outcome in shareholder voting contests."). Risk Metrics is the dominant proxy advisory firm and "claims over 1,700 institutional clients managing $26 trillion in assets, including 24 of the top 25 mutual funds, 25 of the top 25 asset managers and 17 of the top 25 public pension funds." Choi et al. at 652–63 (quoting Robert Daines et al, *Rating the Ratings: How Good are Commercial Governance Ratings?*, at 2 (Stanford Univ. Rock Ctr. For Corp. Governance Working Paper Series, Paper No. 1, 2008)).

249. *E.g.*, Risk Metrics Group, U.S. Season Preview: Board Issues (Feb. 11, 2010), *available at* http://www.riskmetrics.com/docs/board-preview; Glass, Lewis & Co., U.S. Proxy Paper Policy Guidelines: An Overview of the Glass Lewis Approach to Proxy Advice for U.S. Companies (2010), *available at* http://www.glasslewis.com/downloads/policies/USPolicyGuidelinesSummary2010.pdf.

250. Tr. at 131 (Burkle).

players at Risk Metrics are savvy, they are unlikely to make the sort of commitments to Yucaipa that it seems to need to give it the intestinal fortitude to actually contest an election, such as agreeing to make a recommendation to its clients if certain candidates and promises are made. But if Yucaipa is genuinely interested in some substantive give and take about Barnes & Noble, and the kind of slate and platform that might be appealing to Risk Metrics and the other proxy advisors, the Rights Plan does not inhibit conversation of that nature. Indeed, with all of the experts agreeing that the proxy advisor Risk Metrics is most likely to support Yucaipa's slate over management's, it appears that any conversations Yucaipa may have with Risk Metrics will bear fruit.[251]

Similarly, Yucaipa's argument that it is inhibited by the Rights Plan from speaking even in general terms with other stockholders about their thoughts about Barnes & Noble and its business strategy and board in advance of launching a proxy contest is not credible. Although triggering a pill is more dangerous than simply violating Schedule 13D, institutional investors do not like to trigger § 13D and know how to have conversations that do not trigger the formation of a group subject to Schedule 13D. Yucaipa can *listen* if that is what it wishes to do; the only inhibition it faces is if it wishes to bargain with other investors and reach agreements about voting based on mutual concessions. And, importantly, once Yucaipa actually names a slate, it is free, per *Moran* and the Barnes & Noble Rights Plan, to solicit revocable proxies in the ordinary manner.

For all these reasons, Barnes & Noble has convinced me that the Rights Plan is not an unreasonable device that "fundamentally restricts" Yucaipa from winning a proxy contest.[252] To the contrary, the record shows that if Yucaipa makes a good merits case, it is likely to win.[253] There is no doubt that the trial records in this case is more detailed than the information that was available to the Barnes & Noble board at the time its decisions were made. Some of the board members were less than ideally familiar, when tested through complicated questions from skilled lawyers for Yucaipa, in addressing the Rights Plan's reach. But, considered as a whole, the evidence presented at trial shows that the board focused reasonably on the key problem of preclusion, and operated under and in conformity with the assumption that Yucaipa could not be foreclosed from running a successful proxy contest. Barshay advised the board that the Rights Plan could not be designed so as to preclude a successful proxy contest. And, the evidence showed that the board operated with the understanding that the Rights Plan did not preclude Yucaipa from running a contest; indeed, the board frequently acted in a manner that suggests they believed Yucaipa's proxy contest would be successful notwithstanding the Rights Plan.

In this respect, it is critical that the board used a 20% trigger rather than a 15% cap. With the Riggios' ownership, that threshold was reasonable because setting the threshold any higher would have only made Yucaipa's creeping acquisition of control more likely. It may be that options other than a pill with a 20% trigger were available,[254] but the 20% pill was

**251.** *Id.* at 405–06 (Taxin), 656–58 (Burch), 711–13 (Harkins).

**252.** *Moran,* 500 A.2d at 1355.

**253.** *See id.* (noting that "the key variable in proxy contest success is the merit of an insurgent's issues, not the size of his holdings").

**254.** At trial, I mused over the idea of a pill that would have allowed Yucaipa to buy up to

certainly a reasonable alternative and that is the requirement under *Unocal*, not perfection. By preventing the formation of a control bloc, the Rights Plan created an incentive for Yucaipa to make a value-maximizing proposal to all stockholders if it wished to gain control for itself with the board's assent, while leaving Yucaipa with the ability to run a successful proxy contest to obtain board representation if it did not choose to make an offer. All the Rights Plan denies to Yucaipa is the chance, in the first instance, to form a bloc with Aletheia or through its own purchases, use that bloc to seat three new directors and oust the company's founder from the board, and thereafter freely use its new influence to explore ideas like having Yucaipa be the lead equity investor in a going private transaction. Notably, Yucaipa is left the chance to gain influence by electing three directors at the next meeting, and three more at the following meeting. It just must do so by convincing other stockholders on the merits to vote for its slate, and without entering into mutual agreements about joint governance that raise the spectre of a de facto control bloc. Importantly, Yucaipa and other Barnes & Noble stockholders will also have a chance to vote on the Rights Plan before the end of this year, another feature that minimizes its preclusive effect.

\* \* \*

In the last week, the Barnes & Noble board announced that it intends to evaluate strategic alternatives, including a possible sale of the company. The strategic process is to be led by a special committee of four of the company's independent directors, a group that does not include any director this decision has found to be non-independent. In the announcement, Leonard Riggio indicated that he might propose a going private transaction in which he was one of the lead equity investors. The parties have filed short letters dueling over the relevance of this. Yucaipa claims that the appointment of a special committee to address a possible sale is telling, given that such a special committee was not formed to address whether to adopt the Rights Plan. I do not find this important development of material importance to the current issues before me. Indeed, the Rights Plan helps the special committee by freezing Riggio's ability to proceed with a tender offer and thus gives the committee more negotiating leverage. Of course, it is true as Yucaipa says, that this announcement could affect the arguments in play in any proxy contest. But it is equally true that other investors might prefer to elect new directors to make sure that any strategic process is not overly influenced by Riggio. The board's announcement may also suggest that it harbors genuine concern that the management slate may go down to defeat at the polls, precisely because a stockholder majority might perceive that the incumbent board has not done all it could to maximize the value of Barnes & Noble.

Although it is of course certain that this announcement will itself result in the filing

---

20% and form a group to run a proxy contest of no more than 25%, which would have allowed it to talk to other small holders. The board's advisor, Barshay, indicated he had not considered such an idea. Rather, he focused, in my view reasonably, on the notion that a standard pill with a cap higher than 20%—such as 25%—would allow for the formation of a de facto control bloc between Yucaipa and Aletheia (or another activist) through conscious parallelism. Notably, Yucaipa has evinced little interest in talking to small stockholders without potent voting power. Its desire was to be able to both own 37% itself *and* form a joint group with Aletheia, a group that would control a majority of Barnes & Noble's shares. Indeed, under Yucaipa's scenario, it and Aletheia could do a street sweep of Barnes & Noble's remaining public shares.

of new litigation that may require rulings by this court in a new case, the possibility that the board will consider an offer by Riggio or others, including Yucaipa if it wishes, for a sale of the company, does not in my view change the outcome of the current dispute between Yucaipa and the board.

### IV. *Conclusion*

For the foregoing reasons, the defendants have shown that their adoption and use of the Rights Plan was a good faith, reasonable response to a threat to Barnes & Noble and its stockholders. Therefore, Yucaipa's numerous counts for breach of fiduciary duty are DISMISSED, as are its counts for declaratory judgment. IT IS SO ORDERED.